**PUBLISH**

**UNITED STATES COURT OF APPEALS**

March 3, 2014

**TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JERMAINE LAMAR MOSLEY,

    Defendant - Appellant.

No. 13-3101

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 6:12-CR-10214-EFM-1)**

_____

John K. Henderson, Jr., Assistant Federal Public Defender, Wichita, KS, for Defendant-Appellant.

James A. Brown, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with him on the brief), Topeka, KS, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, **BALDOCK**, and **PHILLIPS**, Circuit Judges.

_____

**BALDOCK**, Circuit Judge.

_____

    Defendant Jermaine Mosley entered a conditional guilty plea to one count of being

a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He appeals the

district court's denial of his motion to suppress the gun that was the basis of this offense. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

At about 3:00 a.m. on Friday, September 21, 2012, Wichita police officers received word from Sedgwick County 911 that two black males were handling a gun while sitting in a black Ford Focus parked in a Denny's parking lot. The 911 caller had identified himself as Brandon Jackson, but admitted that he himself had not seen the gun; rather another anonymous person told Jackson about the gun. Ultimately, the district court found this tip was anonymous as far as the police were concerned.

Two officers initially responded to the call. They pulled into a shopping center next to the Denny's. Only one black Ford Focus was in the Denny's parking lot. The officers then began to sneak up on the car from the front passenger's side with weapons drawn. When the officers were 25 to 30 feet from the car, they could see two black males inside. The officers then approached the car; one crossed in front of the car from the passenger's side over to the driver's side, and one remained on the passenger's side. With weapons raised, the officers caught the car's occupants off guard, shouting "Hands up, hands up, get your hands up." The driver put his hands up immediately. Defendant (the passenger), however, did not. Although he hesitated briefly and appeared momentarily disoriented, Defendant quickly began making furtive motions with his right shoulder and arm that officers testified were consistent with trying to either hide or retrieve a weapon. In response, one of the officers began yelling louder and kicking the driver's door to shock Defendant into compliance. After ignoring repeated commands to

put his hands up, Defendant eventually complied. After Defendant raised his hands, one of the officers re-holstered his weapon, opened the passenger's door, and ordered Defendant to exit the car. Defendant did not immediately comply or respond so the officer pulled him from the car, put him on the ground face-down, and handcuffed him. Another officer then took Defendant into custody.

After the two occupants had been detained, one of the officers advised the others (multiple officers were by now on the scene) that Defendant "dumped a gun under [the passenger's] seat." Another officer then searched underneath the passenger's seat and found a black Ruger nine-millimeter handgun. Prior to recovering this gun, none of the officers had actually observed a gun.

A grand jury indicted Defendant on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Defendant moved to suppress the gun as the fruit of an unlawful search and seizure in violation of the Fourth Amendment. In ruling on Defendant's motion to suppress, the district court concluded (1) Defendant was first seized when police surrounded the car and shouted "hands up," (2) this seizure was a Terry stop, and (3) Defendant had standing to challenge this initial seizure. Nevertheless, the court also concluded the officers possessed the requisite reasonable suspicion to justify the Terry stop and therefore the seizure did not violate Defendant's Fourth Amendment rights. The court thus denied Defendant's motion to suppress. On appeal, Defendant argues (1) he has standing to contest the lawfulness of the stop and to seek suppression of the gun found in the vehicle as the fruit of that unlawful stop, (2) the amount of force used by the officers to detain him rose to the level of a de facto arrest,

and (3) neither the anonymous tip about the gun nor the totality of the circumstances justified his seizure.

## II.

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." United States v. Apperson, 441 F.3d 1162, 1184 (10th Cir. 2006) (quoting United States v. Katoa, 379 F.3d 1203, 1205 (10th Cir. 2004)). "We also review de novo the issue of whether a defendant has standing to challenge a search." United States v. DeLuca, 269 F.3d 1128, 1131 (10th Cir. 2001). Furthermore, "the key question here—when the seizure occurred—is a legal one that we must examine de novo." United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010).

## A.

We first address the issue of Defendant's standing to challenge the admissibility of the gun under the Fourth Amendment. "Fourth Amendment rights are personal, and, therefore, 'a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises.'" United States v. DeLuca, 269 F.3d at 1131 (quoting United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)). As such, "without a possessory or property interest in the vehicle searched, 'passengers lack standing to challenge vehicle searches.'" Id. at 1132 (quoting United States v. Eylicio-Montoya, 70 F.3d 1158, 1162 (10th Cir. 1995)). Even where a defendant lacks "the requisite

-4-

possessory or ownership interest in a vehicle to directly challenge a search of that vehicle," however, "the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the defendant's illegal detention." Id. (internal marks and citations omitted). In DeLuca, the defendant conceded "he did not have a possessory or property interest in the vehicle in which . . . methamphetamine was found," and we therefore held he "lack[ed] standing to directly challenge the search of the vehicle." Id. Nevertheless, we concluded the defendant had standing "to contest the lawfulness of his own detention and to seek to suppress the methamphetamine as the fruit or derivative evidence of that illegal detention." Id. To suppress evidence as the fruit of his unlawful detention, a defendant must show, first, that he was seized in violation of his Fourth Amendment rights and, second, that "a factual nexus" exists between his unlawful seizure and detention and the challenged evidence. Id. "'Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not fruit of the poisonous tree.'" Id. (quoting United States v. Nava–Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000)) (internal quotation marks omitted).

Like DeLuca, Defendant conceded he did not have a possessory or property interest in the vehicle in which the gun was found. He therefore lacks standing to challenge the search of the vehicle directly but does have standing to contest the lawfulness of his own seizure and seek to suppress the gun as the fruit of that seizure. This means he must show that the officers violated his Fourth Amendment rights when

-5-

they seized him, and that a factual nexus existed between this unlawful seizure and the discovery of the gun under his seat. [1]

B.

We now address whether Defendant was seized in violation of his Fourth Amendment rights. We first explain that, by the time Defendant was seized within the meaning of the Fourth Amendment, the officers possessed the requisite reasonable suspicion to justify a <u>Terry</u> stop. We then address, and ultimately reject, Defendant's argument that the amount of force used by the officers transformed the interaction into a de facto arrest without probable cause. We therefore conclude Defendant's Fourth Amendment rights were not violated.

---

[1] By way of a post-argument Fed. R.App. P. 28(j) letter, Defendant argues that the factual nexus requirement of <u>DeLuca</u> should not apply in cases where the initial seizure of the vehicle was unlawful. Defendant, however, misconstrues <u>DeLuca</u>. Although the initial seizure in <u>DeLuca</u> was lawful, the opinion nowhere cabins its test to lawful vehicle seizures that later become unlawful detentions. <u>But see</u> <u>United States v. Ibarra</u>, 853 F. Supp. 2d 1103, 1107 (D. Kan. 2012) ("<u>DeLuca</u> is inapposite if the initial traffic stop was invalid."). Rather, whether the initial seizure of the vehicle was lawful goes to whether the factual nexus requirement is satisfied. <u>See</u> <u>United States v. Mosley</u>, 454 F.3d 249, 256 (3d Cir. 2006) ("[E]ven under the Tenth Circuit's heightened 'factual nexus' test, such a temporal scenario [in which the illegal police conduct preceded the means by which the evidence was obtained] would appear to clearly supply the requisite 'factual nexus.'"); <u>United States v. Roberts</u>, 91 F. App'x 645, 648 (10th Cir. 2004) (unpublished) ("[I]n those cases [where] the illegal conduct *preceded* the means by which the evidence was obtained, [this] establish[ed] the requisite factual nexus between the evidence and the illegal conduct." (emphasis in original)). Because, as we address below, Defendant was never seized in violation of his Fourth Amendment rights, we need not address whether the initial seizure of the vehicle was unlawful or whether, assuming that initial seizure was unlawful, it automatically established the requisite factual nexus under <u>DeLuca</u>.

1.

In order to determine whether the officers violated Defendant's Fourth Amendment rights, "[o]ur first task is to establish at what point in this encounter the Fourth Amendment becomes relevant." Terry v. Ohio, 392 U.S. 1, 16 (1968). The Fourth Amendment provides, in part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Defendant argues the gun should be suppressed as the fruit of his unlawful seizure, and so we must determine, "whether and when" the officers "seized" Defendant within the meaning of the Fourth Amendment. Terry, 392 U.S. at 16. The parties do not dispute that Defendant was at some point seized during his interaction with the officers in the Denny's parking lot; but the parties do dispute *when* this seizure occurred. Defendant argues the officers seized him as soon as they surrounded the car with weapons raised shouting "hands up, hands up." The Government responds, for the first time on appeal, that Defendant was not seized until he was physically pulled from the vehicle. The district court agreed with Defendant that he was first seized when the officers surrounded the car with weapons raised shouting "hands up." This conclusion, however, was incorrect.[2]

---

[2] Defendant argues the Government waived the issue of when he was seized because the Government acquiesced in the district court's conclusion that "the first seizure occurred when the officers approached the car with weapons drawn and instructed the occupants to put their hands in the air," and then conceded that Defendant "ha[d] standing to challenge that seizure." But "[w]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." United States v. Sandoval, 29 F.3d 537, 542 n.6 (10th Cir. 1994) (citation omitted); accord United States v. Winningham, 140 F.3d 1328, 1332 (10th

In <u>Terry</u>, the Supreme Court stated that a seizure must be "justified at its inception." 392 U.S. at 20. More recently, the Supreme Court has clarified that "a police officer may make a seizure by a show of authority and without the use of physical force, but *there is no seizure without actual submission*; otherwise, there is at most an attempted seizure." <u>Brendlin v. California</u>, 551 U.S. 249, 254 (2007) (emphasis added).[3] "Attempted seizures of a person are beyond the scope of the Fourth Amendment." <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 845 n.7 (1998). We have therefore held that, "When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen submits to the assertion of authority." <u>Salazar</u>, 609 F.3d at 1064 (internal marks omitted)

---

Cir. 1998). True, this concession probably would have at least *forfeited* the issue if the Government were seeking reversal of an unfavorable decision. See <u>United States v. Zubia-Torres</u>, 550 F.3d 1202, 1204–07 (10th Cir. 2008). But here, though the district court erroneously concluded Defendant was first seized when police surrounded the car and the Government erroneously agreed, the court ultimately held for the Government and denied Defendant's motion to suppress. As such, "we may consider . . . alternative grounds for affirmance." <u>United States v. Tinklenberg</u>, 131 S. Ct. 2007, 2017 (2011). An uncontested faulty legal conclusion by the district court need not preclude us from affirming an otherwise proper denial of a motion to suppress when the record below is sufficient to permit us to conclude, as a matter of law, that Defendant's Fourth Amendment rights were not violated. We therefore address the issue.

[3] In <u>Brendlin</u>, the Supreme Court held a passenger was seized during a traffic stop at the moment the driver's car "came to a halt on the side of the road." 551 U.S. at 263. The Court reasoned that "<u>Brendlin</u> had no effective way to signal submission while the car was still moving on the roadway, but once it came to a stop he could, and apparently did, submit by staying inside." <u>Id.</u> at 262. Unlike in <u>Brendlin</u>, here the car was already parked when the officers arrived, and Defendant had an effective way to signal submission—putting his hands up in compliance with the officer's orders or, at the very least, remaining still without making furtive motions—but he did not do so.

(citing California v. Hodari D., 499 U.S. 621, 625–26 (1991)).[4]  Here, Defendant

nowhere argues the officers applied physical force to restrain him when they surrounded

the vehicle.[5]  But the parties also do not dispute that the officers showed their authority

when they surrounded the car with weapons drawn shouting "hands up, hands up."  Thus,

"the primary dispute concerns the submission-to-authority requirement."  Salazar, 609

F.3d at 1064.

---

[4] By way of another 28(j) letter, Defendant points us to United States v. Rodriguez, 739 F.3d 481 (2013).  There we said: "A person is seized for Fourth Amendment purposes when, considering all the surrounding circumstances, the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."  Id. at 486 (quoting United States v. King, 990 F.2d 1552, 1556 (10th Cir. 1993)) (internal marks omitted).  This line of precedent essentially applies the so-called Mendenhall test, formulated by Justice Stewart in United States v. Mendenhall, 446 U.S. 544, 554 (1980): "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  The Supreme Court later adopted this test in cases such as INS v. Delgado, 466 U.S. 210, 215 (1984), and Michigan v. Chesternut, 486 U.S. 567, 573 (1988).  As the Supreme Court made clear in Hodari D., however, Mendenhall "says that a person has been seized 'only if,' not that he has been seized 'whenever'; it states a *necessary*, but not a *sufficient*, condition for seizure—or, more precisely, for seizure effected through a 'show of authority.'"  499 U.S. at 628 (emphases in original).  The Court in Hodari D. then held "assuming that [the officer's] pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled."  Id. at 629.  Thus, the rule as stated in Rodriguez and King applies when the facts indicate the suspect actually submitted to the officers' show of authority.  Were we to apply that rule *alone* here, we would, in effect, be treating the Mendenhall test as *sufficient* to establish a seizure, in direct contravention of Hodari D.

[5] "Hodari D. suggests that touching is required [to meet the physical force requirement]—'[t]here can be no arrest without either touching or submission.'"  United States v. Waterman, 569 F.3d 144, 145 n.2 (3d Cir. 2009) (quoting Hodari D., 499 U.S. at 626–27); see also United States v. Holloway, 962 F.2d 451, 456 (5th Cir. 1992) ("Hodari D. is not explicit as to whether touching is an essential element of 'application of physical force,' but we have found no post-Hodari D. cases supporting [the] proposition that touching is *not* required." (emphasis in original)).

"In determining whether particular conduct constitutes submission to authority, we must examine the totality of the circumstances—the whole picture." Id. at 1064 (internal marks and citations omitted). "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." Brendlin, 551 U.S. at 262. "'[T]o comply with an order to stop—and thus to become seized—a suspect must do more than halt temporarily; he must submit to police authority, for there is no seizure without actual submission.'" Salazar, 609 F.3d at 1066 (quoting United States v. Baldwin, 496 F.3d 215, 219 (2d Cir. 2007)) (internal marks omitted). "'[S]ubmission' under Hodari D. requires, at minimum, that a suspect manifest compliance with police orders." Salazar, 609 F.3d at 1066 (quoting United States v. Waterman, 569 F.3d 144, 146 n.3 (3d Cir. 2009)). The submission-to-authority standard is an objective one: "we consider whether a citizen has submitted to authority by examining the view of a reasonable law enforcement officer under the circumstances." Salazar, 609 F.3d at 1065. Moreover, we have characterized the reasonable officer in this context as "prudent, cautious, and trained." Id. (citations omitted).

Our circuit has applied Hodari D.'s submission-to-authority standard in a variety of circumstances. For example, in Salazar, a Highway Patrol Trooper activated his emergency lights as he drove toward a pickup that was moving suspiciously. The pickup continued to pull forward until the officer directed his spotlight at the driver. The truck then stopped momentarily, backed up for about 20 seconds, stopped again, and then began pulling up slowly toward the driver's side of the patrol car. "When Mr. Salazar's

pickup started to go around Trooper Berner's patrol car, Trooper Berner stepped out of his car, drew his firearm, and yelled at Mr. Salazar to stop and get out of the pickup. At that point, Mr. Salazar complied." Id. at 1061–62. The district court held that Salazar submitted and was thus seized as soon as he stopped his car in response to the Trooper's emergency lights. Id. at 1063. We reversed, and held that, even though Salazar had stopped his pickup after the Trooper showed his authority, he "was not seized [within the meaning of the Fourth Amendment] until he submitted to Trooper Berner's show of authority by obeying the command to get out of his truck." Id. at 1066.

Similarly, in United States v. Harris, 313 F.3d 1228 (10th Cir. 2002), a police officer repeatedly asked the defendant for identification but the defendant ignored the officer and kept walking. Id. at 1231–32. Eventually, the defendant turned and, with his hands in his pockets, began walking backwards while facing the officer. After the defendant refused the officer's request to remove his hands from his pockets, the officer grabbed the defendant's hands, removed them from his pockets, and took him to the police car. We rejected the defendant's argument that he was seized the moment the officer asked for identification. We reasoned that, "even if [the officer's] requests for identification could be construed as an 'assertion of authority,' Defendant did not submit to it. Accordingly, Defendant was not seized for purposes of the Fourth Amendment until [the officer] implemented physical force by removing Defendant's hands from his pockets and escorting him to the police car." Id. at 1235.

In United States v. Morgan, 936 F.2d 1561 (10th Cir. 1991), however, an officer pulled over a car and a passenger got out of the car as soon as it stopped. The officer told

the passenger to "hold up" and the passenger responded, "What do you want?" The passenger then began walking away and ultimately tried to flee. Id. at 1065. We held that, by asking, "What do you want?" before backing away, the passenger "at least momentarily[] yielded to the Officer's apparent show of authority," and was therefore "momentarily" seized when he responded to the officer's question. Id. at 1567 (emphasis omitted).

Although this case falls somewhere between Salazar and Harris, on the one hand, and Morgan, on the other, we find it virtually indistinguishable from United States v. Johnson, 212 F.3d 1313 (D.C. Cir. 2000). There, Johnson was the passenger in a parked car in a "high-narcotics area" and two police officers saw a young woman "leaning into the passenger's window and handing Johnson an object, which they could not identify." Id. at 1314–15. The officers then approached the car and saw Johnson make a "shoving down" motion, consistent with hiding a weapon. Id. at 1315. One of the officers then "drew his gun, advised his partner to do the same, and shouted, 'Let me see your hands.' Johnson did not immediately comply but rather made 'a couple of more shoving motions down' before raising his hands." Id. In analyzing when Johnson was seized within the meaning of the Fourth Amendment under Hodari D., the D.C. Circuit explained:

> Before Johnson raised his hands, [the officer] had made a show of authority but Johnson had not submitted to it. On the contrary, he continued to make "shoving down" motions, gestures that were the very opposite of complying with [the officer's] order, and which a reasonable officer could have thought were actually suggestive of hiding (or retrieving) a gun.

Id. at 1316–17. Further, the court pointed out that, "[i]f the seizure had taken place" when the officer first raised his weapon and shouted "hands up" at Johnson, "we doubt

-12-

very much whether it would have been valid." Id. at 1316. But, the court reasoned, "by the time the stop actually took place, it was supported by Johnson's continued furtive gestures in response to being confronted by a police officer, and that was suspicious enough to support a reasonable belief that Johnson may have been engaged in criminal activity." Id. at 1317. Thus, the D.C. Circuit held Johnson was not seized until he put his hands up, and that his furtive gestures in response to police confrontation gave rise to a reasonable suspicion, validating the Terry stop of Johnson.

Here, as in Johnson, the officers clearly showed their authority by raising their weapons and shouting "hands up," but Defendant—although he may have frozen momentarily out of confusion—did not immediately manifest compliance with their orders. See Salazar, 609 F.3d at 1066; Waterman, 569 F.3d at 146 n.3. True, a reasonable officer shouting "hands up" likely would have viewed Defendant as "seized" had Defendant simply sat still in the car without making furtive motions. See Brendlin, 551 U.S. at 262 ("[O]ne sitting in a chair may submit to authority by not getting up to run away."). Furthermore, had Defendant simply sat still in response to the officer's commands and allowed himself to be seized from the outset, the seizure may not have been valid. See Johnson, 212 F.3d at 1316. But here, as in Johnson, Defendant did not simply remain seated; rather, he began making furtive motions consistent with hiding—or worse, retrieving—a gun. Defendant did not manifest submission; quite the opposite, Defendant went from sitting still before being confronted by the officers, to moving furtively, directly contrary to the officers' commands. We hold Defendant did not submit to the officers' show of authority, and therefore was not "seized" within the meaning of

-13-

the Fourth Amendment, until he manifested compliance with the officers' orders—when he put his hands up.

Furthermore, Johnson supports our conclusion that, by the time Defendant put his hands up and was actually seized, the totality of the circumstances gave rise to reasonable suspicion justifying a Terry stop of Defendant. During "brief investigatory stops of persons or vehicles that fall short of [a] traditional arrest," such as Terry stops, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). "As long as the precautionary measures employed by officers during a Terry stop are reasonable, they will be permitted without a showing of probable cause." Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1030 (10th Cir. 1997). We have held "[f]urtive movements, nervousness, and the fact that conduct occurs in an area known for criminal activity are all appropriate factors to consider in determining whether reasonable suspicion exists." United States v. DeJear, 552 F.3d 1196, 1201 (10th Cir. 2009); see also Johnson, 212 F.3d at 1317 ("[F]urtive gestures in response to being confronted by a police officer[ are] suspicious enough to support a reasonable belief that [a person] may have been engaged in criminal activity."). "We have likewise held that the fact that an incident occurred late at night or early in the morning is relevant to the Terry analysis." United States v. McHugh, 639 F.3d 1250, 1257 (10th Cir. 2011).

Here, by the time Defendant raised his hands in submission to the officers' show of authority, he had already made furtive gestures consistent with hiding or retrieving a

weapon in response to being confronted by police officers. We need not rely on this fact alone, however. One of the officers who responded to the call testified that "shootings" and "several types of situations [had] gone down in that [Denny's] parking lot over the years." We note also that the confrontation occurred at around 3:00 a.m., in response to a tip, albeit anonymous, that one of the occupants of the car in which Defendant sat had a gun in his lap. In light of all these facts, the officers could reasonably suspect Defendant either was or had been engaged in criminal activity, which justified a <u>Terry</u> stop to investigate further. Moreover, these facts render <u>Florida v. J.L.</u>, 529 U.S. 266 (2000), where officers stopped and frisked a citizen based on an anonymous tip alone, inapposite. Defendant's reliance on <u>J.L.</u> is therefore misplaced.

2.

Because the officers possessed the requisite reasonable suspicion justifying a <u>Terry</u> stop by the time Defendant was seized, Defendant's seizure was valid unless the amount of force used transformed the interaction into a de facto arrest without probable cause. Assuming without deciding that the officers lacked probable cause to justify Defendant's initial seizure, we must determine whether the district court properly concluded the officers' actions were consistent with a <u>Terry</u> stop, or if the degree of force used transformed Defendant's seizure into a de facto arrest.[6]

---

[6] The Government argues Defendant waived the issue whether his seizure amounted to a de facto arrest because he did not raise the issue before the district court. This assertion is belied by the record. For example, Defendant's Revised Motion to Suppress says: "The question presented here is whether or not the 911 call . . . establish[ed] reasonable suspicion *or probable cause* to . . . seize *and arrest* [Defendant]." (emphasis added). Furthermore, at the suppression hearing, the court acknowledged that Defendant

-15-

"[O]fficers may use force during a <u>Terry</u>-type detention to the extent that 'such steps are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" <u>Novitsky v. City of Aurora</u>, 491 F.3d 1244, 1254 (10th Cir. 2007) (internal alterations omitted) (quoting <u>United States v. Hensley</u>, 469 U.S. 221, 235 (1985)). "Under certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground." <u>Id.</u> "In evaluating whether the precautionary steps taken by an officer were reasonable, the standard is objective—would the facts available to the officer at the *moment of the seizure* warrant a man of reasonable caution in the belief that the action taken was appropriate." <u>Id.</u> (emphasis added) (internal marks and quotations omitted). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989) (internal marks and citations omitted). This test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

"complains of the manner in which [the officers] made that stop, and I understand his concern, that it was a pretty hot interdiction, if that's the right word . . . ." Indeed, even the Government at times discussed Defendant's seizure below in terms of "arrest" and "probable cause." In short, we do not believe Defendant waived or even forfeited this issue and therefore address it. <u>Cf.</u> <u>Zubia-Torres</u>, 550 F.3d at 1205 ("[W]aiver is accomplished by intent, [but] forfeiture comes about through neglect." (citation omitted)).

Id. Further, "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. Moreover, "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97. Finally, although an arrest, unlike a Terry stop, requires probable cause, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).

"Although effectuating a Terry stop by pointing guns at a suspect may elevate a seizure to an 'arrest' in most scenarios," United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993), "the use of guns in connection with a [Terry] stop is permissible where the police reasonably believe they are necessary for their protection," United States v. Merritt, 695 F.2d 1263, 1273 (10th Cir. 1982). For example, in Perdue, 8 F.3d at 1458, officers saw a car enter a long dirt road leading to a remote building where marijuana was being cultivated. Officers knew at the time that the building's bedroom contained a pistol and an unloaded shotgun. With weapons drawn, the officers stopped the car and ordered the driver to get out of the car and lie face down. The government conceded the officers did not have probable cause to arrest the driver at the time of the stop. Nevertheless, we held that this initial stop was in fact a Terry stop and that "[i]t was not unreasonable under the circumstances for the officers to execute the Terry stop with their weapons

-17-

drawn." Id. at 1462. Although the officers had no idea whether the driver was armed, we reasoned that "[t]he officers knew that guns were found on the property where marijuana was being cultivated. This fact alone justifies any concern the officers had for their personal safety." Id. at 1463. We further reasoned that "The Fourth Amendment does not require that officers unnecessarily risk their lives when encountering a suspect whom they reasonably believe to be armed and dangerous." Id. We therefore held "the officers conducted a reasonable Terry stop[ and, a]lthough bordering on an illegal arrest, the precautionary measures of force employed by the officers were reasonable under the circumstances." Id.

In light of Perdue, we cannot hold the officers acted unreasonably when they initially stopped Defendant with weapons raised. In Perdue, the only fact indicating the driver may have been armed or had weapons in his car was the fact that he was driving toward a remote building in which officers had found marijuana, a pistol and an unloaded shotgun. Here, officers were in a high-crime area, at around 3:00 a.m., and had received an anonymous tip that one of the occupants of the car in which Defendant sat had a gun in his lap. Furthermore, by the time the officers had actually seized Defendant within the meaning of the Fourth Amendment, they had witnessed him making furtive motions consistent with hiding or retrieving a weapon in response to their show of authority.[7]

---

[7] Although the officers had their weapons raised before Defendant made furtive motions, the Fourth Amendment does not become relevant until the moment Defendant was seized. See Terry, 397 U.S. at 16; Novitsky, 491 F.3d at 1254. As explained above, Defendant was not seized until after he made the furtive motions. At that point, officer safety concerns justified effecting the Terry stop with weapons drawn. See Perdue, 8 F.3d at 1463.

Under these circumstances, we cannot say the precautionary measures of force employed by the officers were unreasonable or rose to the level of a de facto arrest. Moreover, as Perdue makes clear, when officers have the requisite reasonable suspicion to justify a Terry stop of the occupants of a vehicle, and reason to believe those occupants may be armed and dangerous, the officers may reasonably order the occupants out of the vehicle "as a means of neutralizing the potential danger" without elevating the stop to the level of an arrest. 8 F.3d at 1463. Thus, the officers also acted lawfully when one officer opened the car door and ordered Defendant out of the vehicle.

Because the officers acted lawfully when they ordered Defendant out of the car and Defendant did not comply, we need not decide whether the officers' actions thereafter rose to the level of an arrest. Defendant's failure to comply with this lawful order gave the officers probable cause to arrest him at least for the Kansas criminal offense of "interference with law enforcement." See Kan. Stat. Ann. § 21-5904(a)(3) ("Interference with law enforcement is . . . knowingly obstructing, resisting or opposing any person authorized by law . . . in the discharge of any official duty"). In other words, even assuming the officers' use of force at this point transformed Defendant's seizure into a de facto arrest, still no violation of Defendant's Fourth Amendment rights occurred because, by that time, the officers had the requisite probable cause to justify arresting him. See Atwater, 532 U.S. at 354.

Having established Defendant was not seized in violation of his Fourth Amendment rights, we need not decide whether a factual nexus existed between Defendant's seizure and the search of the vehicle that yielded the gun under Defendant's

-19-

seat.   Accordingly, the district court's denial of Defendant's motion to suppress is

AFFIRMED.