NOT DESIGNATED FOR PUBLICATION

No. 116,259

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CORA J. JACKSON,
*Appellant*.


MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed September 15, 2017. Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Natasha Esau*, assistant district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before ARNOLD-BURGER, C.J., GARDNER, J., and STUTZMAN, S.J.


PER CURIAM: After a jury trial in Reno County, Kansas, Cora J. Jackson was found guilty by a jury of criminal threat and interference with a law enforcement officer. As part of her sentence she was ordered to pay a $200 DNA database fee. On appeal she asserts that the evidence was insufficient to support her conviction on both charges and that the court erred in not sua sponte considering her financial circumstances before assessing the $200 fee. Because we find that the evidence was sufficient to support her conviction for both charges and the district court was not required to sua sponte review her financial circumstances, we affirm her convictions and sentence.

1

Jackson, an 80-year-old Reno County resident, discovered a stray dog on her property. She fed it, gave it medical attention, and tried to make it her own; however, the dog remained "wild" and did not become a conventional pet. The dog was aggressive, attacked her chickens, and nipped and jumped at Jackson. Jackson tried to have the dog removed, but she lived outside the city limits and was outside the jurisdiction of the City of Hutchinson Animal Control, and the dog had never injured anyone, so the Reno County Sheriff's officers would not remove it. All of that changed on the morning of July 29, 2015.

Jackson called for a ride to the store using the Reno County Area Transit (RCAT) program. The bus driver got out to help Jackson into the bus, and in the process was nipped at, jumped on, and bitten by the stray dog on the property. A Reno County Sheriff's deputy went to Jackson's home that afternoon to investigate the reported dog bite. After talking with Jackson and observing first-hand the dog's aggression, the deputy determined that the dog was a safety concern for her and those who came to assist her. Jackson wanted the dog removed, so the deputy contacted his superiors, and then intervened with Animal Control to request the dog be removed.

Animal Control Officers (ACOs) Heath Allen and Chad Stutzman responded to the call to impound and quarantine the dog. At initial dispatch, they inquired whether law enforcement intended to accompany them. They were told no in light of the fact that the property owner was willingly giving up the dog. They were in uniform and in a marked Animal Control truck. The rural property was overgrown and the house was not visible from the road.

Initially, the ACOs did not get out of the truck because the dog was circling it. Once it moved away, the men collected their catch poles and got out. They knocked on

2

the front door. Jackson answered and the men identified themselves and told her they were sent to get the dog for quarantine. She said she didn't want the dog, it was a stray, and she wanted them to take it. She signed a form transferring her rights over the dog to the City. Stutzman told Jackson that they would employ two methods for catching the dog: first, they would try catch poles, and then they had a tranquilizer gun, if necessary.

The ACOs told Jackson to go back inside for her safety. She initially complied, but came in and out several times while they looked for the dog. They attempted to catch the dog with their poles for approximately 45 minutes, but the brush was too thick, and the dog was able to go places where the men could not chase it because there was too much clutter in the yard. The ACOs determined that they needed to use the tranquilizer gun to subdue the dog so they could collect it.

The tranquilizer gun was a pump-action, air-powered long gun meant to deliver drugs into the dog to make it fall asleep. When Jackson saw Stutzman get the tranquilizer gun out of the truck, she came outside onto the porch. The men went toward the front porch and told her that they were going to try to drug the dog so it would fall asleep, and then they could collect it and take it to the shelter. She told the men she was glad they had the gun; Stutzman told her it wasn't a real firearm and it was not going to kill the dog.

Stutzman explained the purpose of the tranquilizer gun to Jackson several times, but she became "irate" and told him that if she had wanted the dog shot, she would have done it herself. Jackson then told Stutzman that she was "going to shoot him in the chest with a shotgun and if he's still breathing she's going to stand over the top of him and shoot him in the head until he's dead with her .22." Stutzman described Jackson as "very aggressive [and] confrontational." When Allen heard Jackson's threat, he immediately called for police backup and told dispatch of the threats. Allen testified, "We could handle the dog, we needed help with [Jackson]."

3

Allen attempted again to explain the purpose of the tranquilizer gun. While Allen was talking to Jackson, the dog came back into the front area of the yard, and Stutzman was able to shoot the drugs into it. The dog ran off, and Allen ran after it. Stutzman placed the tranquilizer gun back in the truck, got his catch pole, and ran after Allen. Stutzman, concerned about Jackson's threat, sent Allen back to the front to keep an eye on Jackson. Allen went up front to watch for the dog and Jackson when he saw Jackson come out of her house with a black, long barreled handgun.

Allen radioed again to anyone listening that the property owner was on the porch with a gun and that they were away from their vehicle and could not get to it. Allen testified, "It became real. You know, the threats were there and now it's happening." Stutzman testified, "[S]he's got a gun and she's already threatened us so it was pretty scary." Feeling scared, Stutzman stopped looking for the dog and took cover.

Allen ran to the backyard to find Stutzman so they could keep an eye on each other, and they tried to hide until backup arrived. He watched for Jackson and saw her pacing the front of her property, from the porch to the driveway, but his line of sight was obscured by the overgrowth. He relocated so he could see her, and at the end of one of her paces, he made eye contact with her. Within three to five seconds, Jackson fired the gun, and Allen ran to the garage for cover. Allen testified, "I was petrified now; just over a dog. I was scared. I, my whole life flashed, my girls, I just couldn't believe that she's out here now. Basically, I felt like she was hunting us down with a gun for coming to help her take this dog off her property that supposedly wasn't even hers." Allen radioed again to report that Jackson shot the gun. At that point Allen and Stutzman began to hear sirens, and they kept hidden for what "seemed like forever," until they eventually heard a sheriff's officer out front ordering Jackson to drop the weapon.

Reno County Sheriff's deputy, Wesley Vaughn, was on duty that evening in uniform and in his patrol vehicle. He was aware of the ACOs at the property trying to

4

collect a dog. He heard over the radio that they needed backup because the property owner was agitated and the ACOs feared for their safety, so he began to drive to the location. While on his way, he heard the update over the radio that Jackson was now armed with a gun. He activated his lights and sirens and began driving more quickly to the property. He parked behind the Animal Control truck in the driveway and as he exited his patrol car, he heard a gunshot.

Vaughn drew his service weapon and began working his way along the brush toward the front of the house and in the direction of the sound of the shot. He saw a person with gray hair approximately 5 to 10 yards away by the side of the house and she had a pistol in her hand. Vaughn actively drew down on her and ordered her to put the gun down. Vaughn issued "loud voice" commands to Jackson to drop the pistol. The woman argued with him and told him she did nothing wrong. Vaughn testified that the exchange went back and forth like that for what "felt like forever." "She was still defiant." At a certain point, Vaughn employed a vulgarity with Jackson and told her to "drop the F-ing gun," but she was walking toward the porch and did not comply. After the fifth time, Vaughn lost count of the number of times he told Jackson to put down the gun. He testified that he didn't know what she was planning to do: turn and fire on him; go after the ACOs; or go inside and become a barricaded subject.

Vaughn testified that he "wasn't getting any sort of compliance," and when Jackson finally appeared to be complying, she did so by raising the hand holding the gun. Vaughn testified, "I was a little bit torn up. Because part of me was saying is she going to start turning this gun on me, am I going to have to shoot this little old lady,' and I, I made a decision if she was going to bring that gun around I was going to have to perform my duty." Ultimately, Jackson placed the gun on a ledge on the porch and walked away from it. Once she was disarmed, Vaughn immediately placed Jackson into custody.

The gun was later identified as a Browning semiautomatic .22 caliber target pistol. It was loaded, armed, and ready to fire. Jackson knew how to use it.

Once Jackson was in custody, the ACOs were able to complete their mission by retrieving and impounding the sleeping dog from the middle of the road approximately three-quarters of a mile from the house.

At trial, Jackson denied all of the law enforcement and animal control officers' accounts of the event. She said that she took her gun, which she keeps loaded, outside with her for protection from the wild dog, as she had to let her miniature dachshund out to go to the bathroom. She testified that she discharged the pistol "out of frustration" into the ground by her sidewalk to preemptively scare the wild dog, just in case it was in the vicinity. The ground was soft and absorbed the bullet. She acknowledged that Allen and Stutzman tried very hard to catch the dog but claimed their vehicle was not visible from her house, they were not in uniform, and they never spoke to her. She also claimed that she ordered Stutzman to shoot the dog and called him a "fat oaf." She denied she threatened Allen and Stutzman.

Jackson recognized that Vaughn was "one of our police officers, Reno County," that he was in uniform, and admitted she heard Vaughn say, "[P]olice, drop the gun," but thought he might be a "killer cop." Jackson did not think her weapon was a match for Vaughn's, testifying:

> "A .22 is no match for an assault weapon. Especially one that's, the assault weapon has hydra-shok ammunition in it. This is ammunition that's been designed specifically when it's fired that it enters the human body and it's spinning and it shreds the organs in the body. That is not the kind of fire power any fool would ever go up against."

6

Jackson acknowledged that Vaughn told her two to three times to drop her weapon, and that she did not comply with his orders. She testified that she "was not about to drop a gun on concrete," and said she "can't" drop a gun in her flower bed.

Jackson was eventually convicted by a jury of criminal threat and interference with a law enforcement officer. K.S.A. 2015 Supp. 21-5415(a)(1); K.S.A. 2015 Supp. 21-5904(a)(3). She was sentenced to the standard jail term of 6 months for the criminal threat conviction and a concurrent standard term of 5 months for the interference with a law enforcement officer conviction. Among other fees, a DNA database fee of $200 was assessed. BIDS application and attorney fees were waived. The jail terms were suspended and Jackson was placed on 12 months' probation. Jackson timely appeals.

ANALYSIS

*The evidence was sufficient to convict Jackson of both charges.*

Jackson claims the evidence was insufficient for a jury to convict her of either charge. Before considering the evidence related to each charge, we must first set forth our standard of review.

*Standard of review*

When the sufficiency of the evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the State. A conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the

7

evidence or the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

*Interference with a law enforcement officer*

To be found guilty of interference with a law enforcement officer, the State was required to prove beyond a reasonable doubt that Jackson knowingly obstructed, resisted, or opposed any person authorized by law in the discharge of any official duty. K.S.A. 2015 Supp. 21-5904(a)(3). Jackson contends that the State failed to meet its burden of proof. So we will review the evidence presented for sufficiency in the light most favorable to the State.

Jackson admitted she recognized Vaughn as a law enforcement officer, and she admitted she did not follow his repeated commands. Jackson contends she did not know why he was there, and that she did not substantially hinder Vaughn or increase his burden while performing his duties. She asserts that because at the time he came upon her holding a firearm in the yard he had resolved his investigation into "'shots fired,'" he was no longer actively investigating a crime. In other words, by the time Vaughn told her to put down her weapon, he was no longer responding to the ACOs' call for assistance. As a result, her refusal to comply with his orders cannot amount to a criminal interference.

The State argues that disobeying lawful commands, even after an investigation is solved, is sufficient to be guilty of interference with law enforcement. The State's argument is persuasive. Available caselaw demonstrates that a defendant's failure to comply with a lawful order provides probable cause for an arrest on the charge of interference with law enforcement. See, e.g., *United States v. Mosely*, 743 F.3d 1317, 1330-31 (10th Cir. 2014). Further:

8

"It is no defense to a charge of obstruction of official duties that a defendant is unaware of the precise order, process, or instruction under which the uniformed law enforcement officer is performing his duties. If a defendant knows or should have known that the individual being obstructed is a properly uniformed and identified law enforcement officer acting in the apparent pursuit of his official duties, then such obstruction is a crime." *State v. Lyne*, 17 Kan. App. 2d 761, 766, 844 P.2d 734 (1992).

The Kansas Supreme Court has held that a law enforcement officer's "official duty" should be defined in terms of the officer's authority, knowledge, and intent. See, e.g., *State v. Hudson*, 261 Kan. 535, 538, 931 P.2d 679 (1997). In this case, Vaughn had only just arrived on scene to provide assistance to two city employees reportedly in fear because an agitated property owner was armed with a gun. He was welcomed by the sound of a gunshot and discovered Jackson with a gun in her hand. Vaughn could not begin to determine whether Jackson did or did not do anything wrong while she was armed. To that end, Vaughn was there as backup for two city employees, and he could not attempt to find them or talk to them while actively engaged in trying to disarm Jackson.

Moreover, Jackson admitted to deciding not to comply with Vaughn's order to drop her weapon because she did not want to drop it onto the concrete path, nor did she want to drop it in her flowerbeds on the softer ground into which she claimed she fired the gun only moments before. She knowingly chose not to follow Vaughn's order, admitting that he told her two or three times to drop the gun.

Based on the evidence admitted at trial, when taken in the light most favorable to the State, it was reasonable for the jury to find that Vaughn was performing his duty and was substantially hindered by Jackson's refusal to comply with his repeated orders to put down her gun. Accordingly, this claim of error fails.

9

*Criminal threat*

To be found guilty of criminal threat, the State was required to prove beyond a reasonable doubt that Jackson threatened to commit violence with the intent to place another in fear, or in reckless disregard of the risk of causing such fear. K.S.A. 2015 Supp. 21-5415(a)(1). Jackson contends that the evidence presented at her trial was insufficient to prove her intent or recklessness in saying something in anger, which may have placed the ACOs in fear. Again, as we are required to do when faced with a challenge as to the sufficiency of the evidence, we will review the evidence presented for sufficiency in the light most favorable to the State.

Although at trial she denied ever talking with ACOs Allen and Stutzman, let alone threatening them, for the first time on appeal she argues that she "'popped off' because she was frustrated, confused, and generally at her wits' end." She cites two out-of-state cases for the proposition that verbal threats that express transitory anger cannot be the basis for a terroristic threat. So, she contends, if her threat was made out of anger, it was transitory. However, she concedes "'transitory anger arguments'" are not persuasive here and in fact were rejected by this court in an unpublished opinion. See *State v. Brubaker*, No. 106,427, 2012 WL 4678655, at *2-3 (Kan. App. 2012) (unpublished opinion). But more importantly, this argument was never made to the jury. Her defense was that she did not make the threat at all, therefore we cannot find the evidence was insufficient based on a defense she never presented.

Because there are no recordings of Jackson making a threat to the ACOs, this issue turns on the jury's assessment of witness credibility at trial. Allen and Stutzman testified that Jackson was acquiescent until the tranquilizer gun was introduced. Both testified that she said if she wanted the dog shot, should would have done that herself; and both testified that she made a detailed threat to get her guns (a shotgun and her .22) and shoot Stutzman in his chest or gut and head until he died. Allen, Stutzman, and Jackson

10

testified that she went in the house and came out with her .22 pistol. Allen, Stutzman, Jackson, and Vaughn all testified that she fired the weapon. Allen, Stutzman, and Vaughn all testified consistently that Jackson displayed a confrontational demeanor, was aggressive, irate, and defiant. Allen and Stutzman testified consistently about the incident, including the chronology of events, and the similar, graphic language of Jackson's threat. Three law enforcement officers' testimonies corroborate details of Allen and Stutzman's accounts of the day, such as hearing the escalating radio calls for backup.

Based on the evidence admitted at trial, when taken in the light most favorable to the State, it was reasonable for the jury to find that Jackson communicated a threat to commit violence and intended to place Allen and Stutzman in fear or made the threat with reckless disregard that she was causing such fear. Accordingly, this claim of error also fails.

*The district court did not err in ordering Jackson to pay a DNA database fee without first conducting a financial assessment.*

"The court shall not lessen or waive [the DNA database registration] fees unless the court has determined such person is indigent and the basis for the court's determination is reflected in the court's order." K.S.A. 2016 Supp. 75-724(c). Jackson contends the district court had an obligation under K.S.A. 2016 Supp. 75-724 to sua sponte conduct a financial assessment and consider her ability to pay the $200 DNA database fee before ordering her to do so.

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015). It is a fundamental rule of statutory construction that the intent of the legislature governs if that intent can be ascertained. *State v. Jordan*, 303 Kan. 1017, 1019, 370 P.3d 417 (2016). An appellate court must first attempt to ascertain legislative intent through the statutory

11

language enacted, giving common words their ordinary meanings. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the legislature's intent. 303 Kan. at 813.

A panel of this court addressed this identical issue recently in *State v. Niehaus*, 54 Kan. App. 2d 29, 32, 395 P.3d 455 (2017), *petition for rev. filed* May 18, 2017, and determined that there is no requirement under the DNA database fee statute that a district court sua sponte engage in a financial analysis before ordering the fee.

Like Niehaus, Jackson analogizes this statute to the BIDS attorney fee statute, K.S.A. 22-4513(b), requiring a defendant to repay the system for legal representation during a criminal case that results in a conviction: "In determining the amount and method of payment of [BIDS fees], the court shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose."

Jackson contends that there is no language within the DNA fee statute that "puts the duty on a defendant to contest the fee," suggesting that if the duty is not on the defendant to contest the fee, it is on the district court to justify it. However, K.S.A. 2016 Supp. 75-724(b) mandates that a court order the fee unless the person can prove two things: (1) they already paid the fee in connection with a prior conviction; *and* (2) they did not submit DNA specimens for the current offense of conviction. A plain reading of subparagraph (b) requires assignment of the fee and places the burden on the defendant to demonstrate it is unwarranted under these two conditions.

12

Jackson, like Niehaus, relies on *State v. Robinson*, 281 Kan. 538, 544, 132 P.3d 934 (2006), for the proposition that an opportunity to petition for a waiver of BIDS fees is not a substitute for a court's meaningful consideration of a defendant's finances. Jackson argues a parallel analysis applies to the DNA fee; however, unlike the BIDS fee statute that expressly directs the district court to consider the financial burden on a defendant before ordering reimbursement, the DNA database fee statute contains no such requirement.

Jackson argues that subparagraph (b) requires the district court "bring up the fee" to defendants and inquire whether they can prove the two prongs to demonstrate they should not be assessed the fee. But the plain language places the burden of proof on the defendant, and there is no requirement that a district court invite the query.

In arguing that the panel in *Niehaus* was wrong to determine there is no requirement for a sua sponte financial analysis, Jackson contends that when the statute prohibits the court from waiving the fees "unless the court has determined such person is indigent" and goes on to reflect the court's determination in the court's order, it means that *the court* must determine indigency. K.S.A. 2016 Supp. 75-724(c). But the plain language of subparagraph (c) mandates only that if the court has made an indigency determination, it must reflect the reasons in its order. Although the *Niehaus* panel found that the plain language of K.S.A. 2016 Supp. 75-724(c) requires a district court to impose the fee and grants discretion to waive the fee when the defendant is indigent, the panel did not find that the statute requires a district court to sua sponte consider a defendant's ability to pay. *Niehaus*, 54 Kan. App. 2d 29, Syl. ¶¶ 2-3.

We find the decision in *Niehaus* persuasive and fully adopt its reasoning. The plain language of the DNA database fee statute does not require the district court to sua sponte conduct a financial assessment before ordering the fee.

13

Affirmed.