**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 25, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

No. 16-6136

LOUIS ROBERSON,

    Defendant - Appellant.

———————————————————

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 5:15-CR-00160-F-1)**
———————————————————

Jeffrey M. Byers, Assistant Federal Public Defender, Office of the Federal Public Defender, Oklahoma City, Oklahoma, appearing for Appellant.

Nicholas J. Patterson, Assistant United States Attorney (Mark A. Yancey, United States Attorney, with him on the brief), Office of the United States Attorney, Oklahoma City, Oklahoma, appearing for Appellee.

———————————————————

Before **HARTZ**, **MATHESON**, and **MORITZ**, Circuit Judges.

———————————————————

**MATHESON**, Circuit Judge.

———————————————————

    Appellant-Defendant Louis Roberson pled guilty to being a felon in possession in

violation of 18 U.S.C. § 922(g)(1). His plea was conditioned on his ability to pursue this

appeal of the district court's denial of his motion to suppress evidence of his firearm under the Fourth Amendment.

Mr. Roberson argued in district court and now on appeal that he submitted to police officers' show of authority when they shined bright lights on him and approached his car in a parking lot. He contends that because he had immediately submitted and was therefore seized at this point without reasonable suspicion, the ensuing search of his car violated the Fourth Amendment.

I would affirm the district court because, assuming the bright lights and officers' approach amounted to a show of authority, Mr. Roberson did not submit until later when the officers had reasonable suspicion to seize him. Judge Hartz would affirm because the police did not exercise a show of authority when they shined the lights and approached the car. Judge Moritz would reverse because the officers' actions amounted to a show of authority and Mr. Roberson submitted before the officers had reasonable suspicion to detain him.

Based on the foregoing, and exercising jurisdiction under 28 U.S.C. § 1291, the court affirms.

## I. **BACKGROUND**

The following facts are taken from evidence presented at the suppression hearing. They are presented in the light most favorable to the Government because the district court denied Mr. Roberson's motion to suppress. *United States v. Moran*, 503 F.3d 1135, 1139 (10th Cir. 2007).

## A. *Factual Background*

Around 10:15 p.m. on December 31, 2014, Mr. Roberson met a blind date, Annette Byers, at Slick Willie's Pool Hall in Oklahoma City. They met in Mr. Roberson's car, which he had backed into a parking spot near the entrance of Slick Willie's. Mr. Roberson and Ms. Byers talked for about fifteen minutes and smoked a marijuana cigarette—Ms. Byers's first. Due to the winter chill, Mr. Roberson left the car running.

At 10:30 p.m., four marked Oklahoma City patrol cars drove into the parking lot in "wolf-pack" technique by entering from different corners of the lot. The officers were not responding to a specific incident. They came instead because Slick Willie's had asked for more frequent police patrol due to problems with criminal activity. Among the police were Sergeants Monte Stephens and Michael Anderson, who entered through the southwest entrance of the parking lot.

Upon entering, Sergeants Stephens and Anderson stopped their patrol car about 15 feet from the first occupied car they saw—Mr. Roberson's car. The officers tried to make what they called "voluntary contact" with Mr. Roberson and Ms. Byers. Because the parking lot was dimly lit, they shined spotlights and bright takedown lights on the car.[1] Sergeants Stephens and Anderson then exited their patrol car and

---

[1] Takedown lights are bright lights that allow police officers to see persons and objects illuminated by the lights and make it difficult for persons to see the officers.

"resolutely" walked toward Mr. Roberson's car from the front. ROA, Vol. I at 54.[2]

The officers' patrol car did not block Mr. Roberson's car, but their line of approach meant that Mr. Roberson would have hit the officers had he tried to drive away.[3]

"As soon as" the officers got out of their car or "pretty simultaneously," the officers saw Mr. Roberson making "stuffing motions" underneath the driver's seat. ROA, Vol. III at 17, 40. After seeing the stuffing motions, the officers ordered Mr. Roberson and Ms. Byers to show their hands. Ms. Byers complied, but Mr. Roberson did not, and instead continued to make the stuffing motions.

The officers then drew their guns and once again commanded Mr. Roberson to show his hands. Mr. Roberson still did not comply. Only when Sergeant Stephens reached the driver's side window—and after about three or four commands to show his hands—did Mr. Roberson stop the stuffing motions, roll down the window, and

---

[2] At the suppression hearing, Sergeant Stephens testified to seeing a cloud of smoke in the car when it was illuminated, but he did not record the observation in his original police report. Because the Government did not rely on this fact to justify the officers' conduct, the court did not make a factual finding as to whether this testimony was credible. Neither do I.

[3] In district court, the parties disputed the location of the patrol car and whether it had blocked in Mr. Roberson's car. The court credited Sergeant Stephens's testimony over Ms. Byers's, finding the patrol car had not blocked the car. The court's factual finding regarding the position of the patrol car and its credibility assessment of Ms. Byers were not clearly erroneous. *See United States v. Jarvison*, 409 F.3d 1221, 1224 (10th Cir. 2005) (stating that we reverse factual findings and credibility assessments only if they are "without factual support in the record" or leave us "with a definite and firm conviction that the district court erred") (quotations omitted).

put his hands on the steering wheel.[4]  The officers opened the door and smelled

marijuana.  They later found a gun under the driver's seat, where Mr. Roberson had

been making his stuffing motions, and a bag of marijuana in the center console.

In the district court's words, "[t]his all unfolded in a big hurry."  ROA, Vol. III

at 104.  According to Sergeant Stephens, the time between the officers' exiting their

car and reaching the car's window was "a matter of seconds.  Probably ten, 15

seconds.  Maybe a little bit more, maybe 30 seconds tops."  *Id.* at 50.[5]

B.  ***Procedural Background***

On August 4, 2015, a federal grand jury indicted Mr. Roberson in the United

States District Court for the Western District of Oklahoma for possessing a firearm as

a felon, in violation of 18 U.S.C. § 922(g)(1).  Mr. Roberson moved to suppress

evidence of his firearm, arguing his seizure and arrest violated the Fourth

---

[4] The district court noted Ms. Byers's testimony that the first thing she remembered seeing after the officers shined their lights was Mr. Roberson sitting with his hands on the wheel.  The court stated this may not have been inconsistent with Sergeant Stephens's testimony that Mr. Roberson made stuffing motions before putting his hands on the wheel because "she didn't really look at [Mr. Roberson] until she saw the [officers'] guns."  ROA, Vol. III at 103; *see also id.* at 77 (Ms. Byers's testimony supporting that finding).  To the extent the testimony conflicted, the court discounted Ms. Byers's testimony because her first experience with marijuana, the bright lights, the guns, and the new setting may have affected her perception or memory.  The court's finding that Mr. Roberson did not put his hands on the steering wheel until after making the furtive motions was not clearly erroneous.  *Jarvison*, 409 F.3d at 1224.

[5] The court found that the time between the officers' exiting their car and smelling marijuana was as little as eight to ten seconds.  The court's finding that the timing was as little as eight seconds is not supported by the record.  But its finding that it was as little as ten is supported by Sergeant Stephens's testimony and is therefore not clearly erroneous.

Amendment, thereby invalidating the search for and recovery of the firearm. On September 24, 2015, the district court held an evidentiary hearing on the suppression motion. Sergeant Stephens and Ms. Byers were the only witnesses.

On December 3, 2015, the court issued a written order denying the motion to suppress. The court held the officers did not "seize" Mr. Roberson within the meaning of the Fourth Amendment until after they had developed reasonable suspicion based on Mr. Roberson's furtive stuffing motions. The arrest and search were therefore valid.

After the court's order, Mr. Roberson pled guilty conditioned on his ability to appeal the denial of the suppression motion. On May 16, 2016, the court sentenced Mr. Roberson to 80 months in prison and three years of supervised release.

## II. **DISCUSSION**

On appeal, Mr. Roberson challenges the district court's order holding the officers did not violate his Fourth Amendment rights. This court should affirm the district court's denial of Mr. Roberson's motion to suppress because Mr. Roberson did not submit to the officers' initial show of authority and therefore was not seized at that time. When the officers later seized Mr. Roberson, they had reasonable suspicion to do so.

### A. *Standard of Review*

"When reviewing the denial of a motion to suppress, we accept the district court's factual findings and determinations of witness credibility unless they are clearly erroneous." *Moran*, 503 F.3d at 1139 (quotations omitted). But "the ultimate

issue of whether a seizure occurred is a question of law, which we review *de novo*." *United States v. Guerrero*, 472 F.3d 784, 786 (10th Cir. 2007).  We also review de novo the question of when a seizure occurred.  *United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010).

## B. *Legal Standards*

### 1. **The Fourth Amendment and Seizure**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A seizure must be "justified at its inception" to comply with the Fourth Amendment.  *United States v. Mosley*, 743 F.3d 1317, 1326 (10th Cir. 2014) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).  Mr. Roberson argues he was seized before the officers had reasonable suspicion to do so in violation of the Fourth Amendment.

Fourth Amendment law recognizes three types of police-citizen encounters: (1) consensual encounters; (2) investigative detentions; and (3) arrests.  Both detentions and arrests are seizures.  Police must have reasonable suspicion of criminal activity for a detention and probable cause that a crime has been committed for an arrest.  *See United States v. Hernandez*, 846 F.3d 1247, 1271-72 (10th Cir. 2017).

A police officer may seize someone either by physical force or a show of authority.  *Salazar*, 609 F.3d at 1064 (quoting *Terry*, 392 U.S. at 19 n.16).  As in this case, "[w]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen

- 7 -

'submits to the assertion of authority.'" *Id.* (brackets omitted) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Because the ensuing analysis relies on whether Mr. Roberson submitted to an assertion of authority, additional legal background on that element follows.

2. **Submission to Authority**

A show of authority alone is not a seizure "without actual submission." *Brendlin v. California*, 551 U.S. 249, 254 (2007). Actual submission depends on "the view of a reasonable law enforcement officer" under "the totality of the circumstances." *Salazar*, 609 F.3d at 1064-65 (quotations omitted). Submission "requires, at minimum, that a suspect manifest compliance with police orders." *Mosley*, 743 F.3d at 1326 (quotations omitted).

In *Brendlin*, the Supreme Court considered whether a car's passenger, and not just the driver, was seized during a traffic stop. 551 U.S. at 251. The Court determined the passenger submitted to the officers' show of authority (flashing lights directing the car to pull over) by staying inside the car. *Id.* at 260, 262. The Court reasoned that the passenger "had no effective way to signal submission while the car was still moving on the roadway, but once it came to a stop he could, and apparently did, submit by staying inside." *Id.* at 262.

Interpreting and applying *Brendlin*, among other Supreme Court and Tenth Circuit cases, we considered in *Mosley* whether, from a reasonable officer's perspective, an individual's momentary hesitation before making furtive motions constituted submission to a show of authority. 743 F.3d at 1324, 1327. We held that

it did not. *Id.* at 1327. The police in *Mosley* received an anonymous tip that two people were handling a gun in a car in a Denny's parking lot. *Id.* at 1321. Two officers responded and approached the car from the side with weapons drawn. *Id.* Catching the car's occupants off guard, the officers—with weapons raised—shouted for the occupants to put their hands up. *Id.* The driver complied, but the passenger—the defendant—did not. *Id.* The defendant "hesitated briefly" and then "quickly began making furtive motions [that] . . . were consistent with trying to either hide or retrieve a weapon." *Id.* The defendant ignored repeated commands to put his hands up but eventually complied. *Id.* When the defendant disobeyed commands to exit the car, an officer pulled him out, handcuffed him, and took him into custody. *Id.* at 1321-22.

The district court denied the defendant's motion to suppress, and we affirmed. *Id.* at 1321. Although the officers' actions amounted to a show of authority, we held the defendant was not seized until he complied with their commands to put his hands up. *Id.* at 1327. The defendant did not "immediately manifest compliance with [the officers'] orders" when he "froze[] momentarily" before making his stuffing motions. *Id.* We acknowledged "a reasonable officer shouting 'hands up' likely would have viewed [the defendant] as 'seized' had [he] simply sat still in the car without making furtive motions." *Id.*[6] But the defendant's furtive motions, consistent with hiding or retrieving a gun, did not manifest submission, and instead were "directly contrary to

_____

[6] We said nothing, however, about how long he would have had to sit "still" to constitute an objective submission from a reasonable officer's viewpoint.

- 9 -

the officers' commands." *Id.* Under the totality of the circumstances, a reasonable law enforcement officer would not view the defendant as submitting until he complied with the officers' orders to put his hands up. *Id.*[7]

*Mosley* relied in part on our decision in *Salazar*, which addressed whether a brief hesitation amounted to submission. *Id.* at 1326 (discussing *Salazar*, 609 F.3d at 1067). In *Salazar*, a police officer saw a pickup truck entering a parking lot and drove his patrol car toward the pickup. 609 F.3d at 1061-62. The pickup driver turned on the truck's headlights and drove toward the patrol car. *Id.* at 1062. The officer turned on his emergency lights. *Id.* The pickup driver continued to drive toward the patrol car, stopped, shifted to reverse, and then backed up for 20 seconds. *Id.* The pickup truck "momentarily stopped" and then drove forward around the driver's side of the patrol car. *Id.* When the truck moved past the patrol car, the officer got out of the car, drew his firearm, and ordered the defendant to stop and get out. *Id.* The defendant complied. *Id.*

On appeal, relying on our precedent and Supreme Court cases, including *Brendlin*, we held there was no submission to the officer's show of authority until the

---

[7] We stated that, unlike *Brendlin*, where the passenger defendant had no effective way to signal submission before the car was stopped, in *Mosley*:

> the car was already parked when the officers arrived, and [the d]efendant had an effective way to signal submission—putting his hands up in compliance with the officer's orders or, at the very least, remaining still without making furtive motions—but he did not do so.

743 F.3d at 1324 n.3.

defendant complied with the officer's command to exit his truck. *Id.* at 1064, 1067.

We said a reasonable officer would not have viewed the defendant's "momentary[]

stop" (or "fleeting pause") after his 20 seconds of backing up as a submission to

authority. *Id.* at 1068.[8]

*Mosley* also relied on *United States v. Johnson*, 212 F.3d 1313 (D.C. Cir.

2000), which we stated was "virtually indistinguishable." *Mosley*, 743 F.3d at 1327.

In *Johnson*, officers patrolling in a "high narcotics area" saw two people in a parked

car in a parking lot. 212 F.3d at 1314. One officer saw the defendant make a

"'shoving down' motion, leading him to believe that [the defendant] might be

armed." *Id.* at 1315. The officer drew his gun and shouted, "Let me see your hands."

---

[8] In reaching this conclusion, we distinguished *United States v. Morgan*, 936 F.2d 1561 (10th Cir. 1991). *Salazar*, 609 F.3d at 1067-68. We explained that the *Morgan* defendant had submitted to a show of authority, "at least momentarily," by asking an officer, "What do you want?" before attempting to flee. *Id.* at 1068 (quoting *Morgan*, 936 F.2d at 1565, 1567). Unlike *Morgan*, where a reasonable officer could have viewed the defendant's brief attempt at conversation as yielding to a show of authority, there was no conversation between the officer and defendant in *Salazar*. *Id.* We concluded "the fleeting pause of a moving vehicle" would not show submission to a reasonable officer. *Id.*

The Sixth Circuit distinguished *Morgan* on similar grounds when it assessed whether a "momentary pause" without a conversation constituted submission to authority. *United States v. Jeter*, 721 F.3d 746, 752-53 (6th Cir. 2013) (finding no submission where suspect "momentar[ily] paused" as officers approached him, then abandoned his bicycle and ran away, without any attempt to converse with the officers).

Other circuits have not taken *Morgan*'s approach and instead have held that a momentary hesitation and a brief conversation did not amount to submission. *See e.g.*, *United States v. Smith*, 633 F.3d 889, 893 (9th Cir. 2011) (no submission where suspect "initially hesitated and engaged in short verbal exchange" with police); *United States v. Valentine*, 232 F.3d 350, 359 (3d Cir. 2000) (no submission when the defendant paused for a few moments and gave his name to officers).

- 11 -

*Id.* The defendant "did not immediately comply but rather made 'a couple of more shoving motions down' before raising his hands." *Id.* The officer then searched the defendant and found cocaine on him. *Id.*

The D.C. Circuit held that a seizure did not take place "immediately after [the defendant's] first 'shoving down' motion," as the defendant had not yet submitted to the officer's show of authority. *Id.* at 1316. "On the contrary, [the defendant] continued to make 'shoving down' motions, gestures that were the very opposite of complying with [the officer's] order, and which a reasonable officer could have thought were actually suggestive of hiding (or retrieving) a gun." *Id.* at 1316-17. The court held that those "continued furtive gestures in response to being confronted by a police officer" created reasonable suspicion to stop the defendant. *Id.* at 1317. Because reasonable suspicion supported the stop, the following frisk and discovery of the cocaine was proper. *Id.*

## C. *Analysis*

Mr. Roberson ultimately was seized. Sergeants Stephens and Anderson first detained him based on reasonable suspicion and then arrested him based on probable cause. They next searched his car and found the firearm under the driver's seat.

The critical question for resolution of this appeal is when Mr. Roberson was seized.[9] The timing of the seizure matters because the firearm evidence must be

---

[9] In his opening brief, Mr. Roberson contends he was seized not only by submitting to a show of authority but also by physical force when the officers shined their lights and approached his car. But we have generally required physical touching for a

Continued . . .

suppressed if he were seized before the officers developed reasonable suspicion. *Mosley*, 743 F.3d at 1326. As noted above, the seizure question here turns on a show of authority/submission to authority analysis.

To resolve this appeal, I assume the officers' initial conduct—shining bright lights on Mr. Roberson's car and walking toward the car—was a show of authority, which escalated when the officers commanded Mr. Roberson to put his hands on the steering wheel. The question is whether, based on the nature of the show of authority, Mr. Roberson submitted to that initial show of authority.[10] He did not. Instead, he submitted and was seized only later when he put his hands on the steering wheel in compliance with the officers' commands. This was the first moment a reasonable officer would think Mr. Roberson had submitted. The officers already had reasonable suspicion before this happened.

1. **Analytical Considerations**

The following discussion focuses on (1) three key parts of what happened, (2) three aspects of *Mosley*, and (3) two main points that structure the analysis.

---

seizure to occur through physical force. *Brooks v. Gaenzle*, 614 F.3d 1213, 1222 (10th Cir. 2010) (discussing how we interpret *Hodari D.* as standing for the proposition that "a 'seizure' occurs only when a fleeing person is *physically touched* by police or when he or she submits to a show of authority by police") (quotations omitted). Mr. Roberson was therefore not seized by physical force.

[10] The dissent mistakenly equates the opinion's assuming there was a show of authority with ignoring its nature. *See* Dissent at 2. But the analysis here considers how the officers showed their authority and how Mr. Roberson responded.

- 13 -

First, this episode included three key parts (as discussed below, parts #1 and #2 happened "pretty simultaneously"):

#1: The officers' shining the lights, exiting their car, and approaching Mr. Roberson's car.

#2: Mr. Roberson's furtive stuffing motions.

#3: Mr. Roberson's compliance with the officers' orders to show his hands.

The Government does not contest the district court's determination that the officers lacked reasonable suspicion at #1. Mr. Roberson, in turn, does not dispute the court's conclusion that the officers had reasonable suspicion to seize Mr. Roberson at #2 when he made his furtive stuffing motions.[11] The parties agree Mr. Roberson had submitted to a show of authority at least by #3 when he showed his hands on the steering wheel. The question is whether he submitted earlier than #3. Mr. Roberson argues the show of authority arose at #1, *see* Aplt. Br. at 19, and that he was seized "immediately" at #1 by submitting to the officers' initial show of authority by not running or driving away, *id.* at 23. I disagree. Under the totality of the circumstances, a reasonable officer would not have viewed Mr. Roberson as submitting "immediately" because he started his furtive motions in response to their show of authority. A reasonable officer would have thought Mr. Roberson submitted

---

[11] Although Mr. Roberson argues there was no reasonable suspicion from the "onset" of the encounter, Aplt. Br. at 11, he does not challenge the district court's determination that the officers developed reasonable suspicion when Mr. Roberson made his stuffing motions after the officers confronted him.

- 14 -

only when he complied with the officers' commands and put his hands on the steering wheel at #3.

Second, three aspects of *Mosley* are especially relevant. First, both here and in *Mosley*, in response to law enforcement's show of authority, the defendants made furtive motions that were directly contrary to submission. Second, in *Mosley*, the defendant briefly hesitated before making furtive motions, whereas Mr. Roberson did not hesitate. Third, in both cases, the defendants did not manifest submission until they complied with the officers' orders to show their hands.

Third, two main points frame the following application of law to the facts. First, when viewed in the light most favorable to the Government, the evidence here is at least as strong to affirm as in *Mosley*. Second, whether and when an individual submits to a show of authority turns on the perception of a reasonable officer, not that of the individual. *Salazar*, 609 F.3d at 1065.

## 2. **Application**

First, viewed in the light most favorable to the Government, *Moran*, 503 F.3d at 1139, the evidence at the suppression hearing showed that Mr. Roberson did not hesitate before furtively hiding his gun in response to the lights and the officers' approach. Rather than remain passively seated, he made furtive stuffing motions beneath his seat consistent with hiding or retrieving a gun. *See* ROA, Vol. III at 105 (district court's finding that the stuffing motions were consistent with concealing or retrieving a gun). Sergeant Stephens testified that the officers' exiting their car and Mr. Roberson's stuffing motions happened "pretty simultaneously." ROA, Vol. III at

- 15 -

40. This means that no time elapsed between #1 (the show of authority) and #2 (Mr. Roberson's furtive stuffing motions). This evidence is stronger than in *Mosley*, where the defendant "hesitated briefly" before his furtive motions, 743 F.3d at 1321.

Mr. Roberson's argument that he submitted and was seized "immediately" at #1 by not attempting to run or drive away, Aplt. Br. at 23, is contrary to the record, which shows there was no time gap between the show of authority at #1 and his furtive motions at #2 to signal his submission to the officers. Mr. Roberson therefore was not seized "immediately" as he contends.

Second, although Mr. Roberson or a reasonable person in his position may have believed he was submitting to the police "immediately" at #1, our precedent makes clear that it is the reasonable officer's perspective that counts in analyzing whether Mr. Roberson submitted. *See Salazar*, 609 F.3d at 1065. A reasonable officer would not have concluded that Mr. Roberson submitted to authority until he complied with the command to show his hands at #3.

Commensurate with the officers' initial show of authority consisting of the bright lights and approaching the car, Mr. Roberson could have attempted to run or drive away to manifest his lack of submission. But Mr. Roberson and the dissent wrongly contend that these were the only ways to refuse to submit. *See* Dissent at 11 (reasoning that Mr. Roberson submitted immediately by remaining seated, rather than fleeing on foot or driving away); Aplt. Br. at 22 (arguing the same).

In *Mosley*, we recognized that furtive motions in response to officers' show of authority reflect lack of submission. *See* 743 F.3d at 1327 (stating that the furtive

- 16 -

motions did not manifest submission but were instead "directly contrary to the officers' commands" shouting "hands up"). *Mosley* thus supports that Mr. Roberson's immediate furtive motions at #2—which were consistent with reaching for a gun under his seat and continued even after the officers shouted their commands to show his hands—were actions a reasonable officer could view as contrary to submission. And as previously noted, Mr. Roberson does not challenge the district court's conclusion that the officers had reasonable suspicion to seize him at #2 when he started making his furtive stuffing motions. A reasonable officer would not have thought Mr. Roberson submitted until he stopped his stuffing motions and complied with the officers' orders by showing his hands on the steering wheel at #3—at which time the officers had reasonable suspicion to seize Mr. Roberson.[12]

\* \* \* \*

The foregoing analysis comports with *Mosley*, where we held that a brief hesitation before engaging in furtive motions would not have signaled submission to a reasonable officer. *See Mosley*, 743 F.3d at 1325 ("To comply with an order to stop—and thus to become seized—a suspect must do more than halt temporarily; he must submit to police authority, for there is no seizure without actual submission.")

---

[12] Mr. Roberson's attempts to distinguish *Mosley* are unavailing. For example, Mr. Roberson points out that the officers in *Mosley* were responding to an anonymous tip, *id.* at 1321, whereas the officers here had no such tip and were instead conducting a general patrol of Slick Willie's. But the fact of the anonymous tip did not affect *Mosley*'s analysis as to whether the defendant submitted. It was instead a fact relevant to whether there was reasonable suspicion to seize the defendant at the time of his submission.

(brackets and quotations omitted).  And, as the record supports, Mr. Roberson did not hesitate before engaging in non-submissive furtive motions.

3. **The Dissent**

The following responds to the dissent's remaining arguments.

First, the dissent argues the foregoing analysis "disregards *Brendlin*'s guidance" that, "depend[ing] on what a person was doing before the show of authority," "an individual can submit to a show of authority through passive acquiescence."  Dissent at 10 (quoting *Brendlin*, 551 U.S. at 255, 261-62).  The dissent errs by overlooking a critical distinguishing fact between *Brendlin* and this case, and by disregarding our circuit's binding precedent.

Quoting *Brendlin* that "passive acquiescence" can consist of remaining seated inside a car, *Brendlin*, 551 U.S. at 255, 262, the dissent would hold that Mr. Roberson "immediately submitted to the officers' command through passive acquiescence by remaining seated in his parked car in response to the command to stay put, rather than attempting to flee on foot or run over the approaching officers by driving away."  Dissent at 11.  The problem with this argument is that, although Mr. Roberson remained inside the car like the *Brendlin* defendant, he did not acquiesce. He instead immediately made furtive motions consistent with reaching for a gun.  *See* ROA, Vol. III at 105.  The dissent "see[s] no reason to consider" Mr. Roberson's

- 18 -

stuffing motions, Dissent at 15, but *Mosley* holds that furtive stuffing motions are inconsistent with submission.[13]

Although the dissent criticizes this opinion's use of *Salazar*'s "reasonable officer" test and "question[s]" our court's "basis for adopting such a test," *see* Dissent at 12-13, it agrees that *Salazar* binds this court, *id.* at 12. The dissent's actual quarrel seems more with our circuit's precedent, not how this opinion follows it.[14]

Second, the dissent argues this opinion "overlooks a critical distinction between the show of force here and the show of force in *Mosley*," *id.* at 14, but its argument is not well-grounded.

The dissent first notes that Mr. Mosley was caught by surprise when the officers approached, *id.* at 13-14 (citing *Mosley*, 743 F.3d at 1321), whereas Mr.

---

[13] The dissent notes that in *Brendlin*, the passenger submitted despite "briefly open[ing] and then clos[ing] the passenger door" rather than "remain[ing] frozen in place." Dissent at 15 n.4 (citing *Brendlin*, 551 U.S. at 252). As the dissent recognizes, the Supreme Court stated that such movements could have been either contrary or consistent with submission. *Id.* (citing *Brendlin*, 551 U.S. at 258 n.4). But here Mr. Roberson's actions left no room for debate—he started furtive stuffing motions that *Mosley* held are directly contrary to submission.

[14] The dissent posits the Supreme Court's "*Mendenhall/Bostick* test" "says nothing about analyzing submission from a reasonable officer's view," Dissent at 12 (referring to *United States v. Mendenhall*, 446 U.S. 544, 544 (1980) and *Florida v. Bostick*, 501 U.S. 429, 435-36 (1991)), and criticizes *United States v. Cardoza*, 129 F.3d 6, 14 n.4 (1st Cir. 1997), which *Salazar* cited in support of the reasonable officer test, Dissent at 12-13. But none of this changes that *Salazar*, and for that matter *Mosley*, are binding circuit precedent.

Whatever merit there may be to the dissent's critique of Tenth Circuit precedent, we must follow it "absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *Barnes v. United States*, 776 F.3d 1134, 1147 (10th Cir. 2015) (quotations and emphasis omitted).

- 19 -

Roberson "had at least a few seconds to process that several patrol cars had entered the parking lot, one patrol car had pinpointed him by shining bright lights on his car, and two officers were aggressively approaching his car." *Id.* at 14. The record shows otherwise. The dissent's assertion that Mr. Roberson perceived "several patrol cars" entering the parking lot conflicts with the district court's finding that Mr. Roberson was not yet aware of any patrol car other than that of Sergeants Stephens and Anderson at the initial show of authority.[15] The dissent also lacks record support for its supposition that Mr. Roberson was not caught off guard, or that he had "at least a few seconds to process" the officers' actions before making his stuffing motions. *Id.*[16]

_____

[15] The district court found that, apart from Sergeants Stephens and Anderson's car, "[t]here [was] no basis in the evidence for a finding that the other squad cars that pulled into other parts of the parking lot contributed . . . to the defendant's perception of his situation." ROA, Vol. I at 51 n.3. The dissent regards this finding as a legal conclusion. Dissent at 4. The district court did not think so, and neither do I.

I disagree with the dissent that, if the finding was factual, it was clearly erroneous. *Id.* at 5-6 n.1. The dissent points to Ms. Byers's testimony that she saw other patrol cars arrive after the first patrol car with bright lights appeared. Dissent at 5-6 n.1 (citing ROA, Vol. III at 107-08). But the dissent overlooks Ms. Byers's further testimony that the "first car" she saw was the one with "the bright lights on," ROA, Vol. III at 63 & 65, and that she "didn't see the [other officers] in the back until [she] was detained," which occurred when Mr. Roberson had already submitted by putting his hands on the steering wheel, *id.* at 66-67. Viewing her testimony in the light most favorable to the Government, as we must, the court's finding was not clearly erroneous.

[16] Ms. Byers's and Sergeant Stephens's testimony cuts against the dissent's assertions that Mr. Roberson was not startled and perceived the police presence before they shined their lights. *See* ROA, Vol. III at 76 (Ms. Byers testifying that her attention was "first" drawn to the officers' spotlight that caught her by "surprise[]");

Continued . . .

- 20 -

Even assuming Mr. Roberson had paused after becoming aware of the officers' show of authority and starting his stuffing motions, any pause would have been a few seconds at most. This is so because, taking the evidence in the light most favorable to the Government, the stuffing motions were only a part of the 10 to 15 seconds between the time the officers exited their car (#1) and smelled marijuana (#3).[17] *Mosley* supports that any such brief hesitation between perceiving a show of authority and making furtive stuffing motions would not signal submission to a reasonable officer. 743 F.3d at 1321, 1327.

The dissent second observes that the officers in *Mosley* explicitly and immediately commanded Mr. Mosley to show his hands, whereas the officers here commanded Mr. Roberson to show his hands only after he started his stuffing motions. Dissent at 13-14. The officers' initial command to Mr. Roberson, in the dissent's view, was an "implicit" one to "stay put." *Id.* at 14. But any difference in the nature of the officers' commands does not materially distinguish *Mosley*. The critical feature in both cases is that neither Mr. Mosley nor Mr. Roberson complied with those commands. Instead, they reacted by engaging in furtive stuffing motions that, from a reasonable officer's perspective, evinced noncompliance with the

---

*id.* at 35 (Sergeant Stephens testifying that, from his perspective, Mr. Roberson was "startled" by the officers). There was no contrary testimony.

[17] Although Sergeant Stephens testified that the timeframe may have been "30 seconds tops," he testified that it was "[p]robably" 10 or 15 seconds. ROA, Vol. III at 50. The evidence viewed in the light most favorable to the Government is that the timeframe was only 10 to 15 seconds.

officers' commands. Because the defendants' reactions to the officers' commands were the same, *Mosley* is analogous for the purpose of analyzing whether Mr. Roberson submitted.

### III. **CONCLUSION**

With Judge Hartz's concurrence and this opinion, a majority of this panel affirms the district court's order denying Mr. Roberson's motion to suppress.

16-6136, *United States v. Roberson*

**HARTZ,** Circuit Judge, concurring:

At 10:30 p.m. on New Year's Eve, six officers of the Oklahoma City Police Gang Enforcement Unit, traveling in four patrol cars, converged on the parking lot of Slick Willie's Pool Hall. At the request of Slick Willie's, officers often patrolled the parking lot, particularly on weekends, because of problems there with assaults and fights. There had been a shooting there in early September. In the words of the district court, Slick Willie's was "beyond any question . . . a place that is very productive of criminal activity [,] . . . a place where arrests take place [,] . . a place where narcotics are dealt " and "a high-crime location . . . . that is frequently in need of law enforcement attention." R., Vol. 3 at 101 (Transcript).

There were four entrances to the parking lot. Officer Monte Stephens, accompanied by Sergeant Michael Anderson, drove his patrol car through the southwest entrance to check out that part of the parking lot while the other officers checked elsewhere. They promptly saw a Chrysler 300 with two occupants in the front seats. Because the lot was not well lit, Officer Stephens turned on his car's spotlight; his emergency lights were not activated. The Chrysler was backed into a parking space, blocked on all sides except its front. Officer Stephens stopped the patrol car far enough away from the Chrysler so as not to block its path. He and Sergeant Anderson then walked "resolutely" toward the Chrysler, R., Vol. 1 at 54 (District Court Order), blocking any escape route for the vehicle. Defendant was in the driver's seat and a woman sat beside him. Although there were four other officers and three other patrol cars in other

areas of the parking lot, the district court found that their presence did not "contribute[], in any way that is significant for present purposes, to [Defendant's] perception of his situation—and his responses to that perception." *Id*. at 51 n.3.

In my view, this conduct by the two officers did not constitute a seizure of Defendant. Nothing they did amounted to an assertion of authority, directing the occupants of the vehicle that they could not depart. There was no forcible restraint, no threat or command, no drawing of a weapon, and no activation of emergency lights. They merely took prudent steps to safely initiate a consensual investigation. If the officers' actions had to be supported by reasonable suspicion or probable cause, it is hard to see how the police can conduct patrols involving consensual conversations in high-risk areas.

Supreme Court precedent does not support the conclusion that Defendant was seized before the officers arrived at his car. A brief review of the Court's doctrine will put this case in context.

The Supreme Court first declared in *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968), that a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." The Court did not, however, define *show of authority*. Not until 1980 did the generally accepted formulation appear, although not in binding precedent. In *United States v. Mendenhall*, 446 U.S. 544 (1980), Justice Stewart, joined only by then-Justice Rehnquist, recognized the competing interests at stake. He wrote, "The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive

2

interference by enforcement officials with the privacy and personal security of individuals." *Id*. at 553–54. "[C]haracterizing every street encounter between a citizen and the police as a 'seizure,'" he continued, "while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." *Id.* at 554. He concluded that a seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.*

This feel-free-to-leave standard has now been adopted by the Court to resolve whether a seizure occurs when police actions "do not show an unambiguous attempt to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence." *Brendlin v. California*, 551 U.S. 249, 255 (2007). But the test has been tweaked for those occasions when "a person has no desire to leave for reasons unrelated to the police presence"; in that circumstance, the proper test is not the free-to-leave test but whether a reasonable innocent person "would feel free to decline the officers' requests or otherwise terminate the encounter." *Id*. (internal quotation marks omitted); *see Florida v. Bostick*, 501 U.S. 429, 438 (1991) ("the 'reasonable person' test presupposes an innocent person").

It is hardly obvious, however, how to determine whether a reasonable innocent person would feel free to leave or to decline a request. For a variety of reasons, most people will not "feel" free to leave or refuse a request when confronted by a police officer. After all, "'[i]mplicit in the introduction of the officer and the initial questioning is a show of authority to which the average person encountered will feel obliged to stop

3

and respond.'"  LaFave, 4 Search and Seizure § 9.4(a) (5th ed.) (original brackets omitted) (quoting *Illinois Migrant Council v. Pilliod*, 398 F.Supp. 882, 899 (1975)). Thus, "if the ultimate issue is perceived as being whether the suspect 'would feel free to walk away,' then virtually all police-citizen encounters must in fact be deemed to involve a Fourth Amendment Seizure."  *Id*.  (footnote omitted) (stating that the free-to-leave standard "should not be given such a literal reading").  We must therefore look to the Supreme Court's application of the test for more specific guidance.

In some circumstances it is obvious that officers, without uttering any words, are exercising their authority—ordering compliance from civilians.  It should be no surprise that the Supreme Court has held that use of a roadblock or emergency lights ordinarily constitutes a seizure.  *See, e.g.*, *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) (seizure where vehicle stopped by police roadblock); *United States v. Cortez*, 449 U.S. 411, 415, 417 (1981) (seizure where vehicle intercepted with emergency lights). Likewise, there is generally a seizure when officers retain the civilian's property with no indication that he or she can have it back before complying with the officers' requests.  In *Florida v. Royer*, 460 U.S. 491, 493–94 (1983) (prevailing plurality opinion by Justice White), two plainclothes detectives had an encounter with the defendant in an airport concourse.  While it was permissible for the detectives to approach and question the defendant, and to request and examine his driver's license and plane ticket, the prevailing plurality of the Court held that there was a seizure once "the officers identified themselves as narcotics agents, told [the defendant] that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket

4

and driver's license and without indicating in any way that he was free to depart." *Id.* at 501.

On the other hand, "[Supreme Court] cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Bostick*, 501 U.S. at 434. And the Court has explained that the free-to-leave standard does not require that the average person be equally likely to stay or leave:

> While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in the detention under the Fourth Amendment.

*I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984) (citations omitted). The Supreme Court has thus granted wide latitude for police attempts at voluntary contact. In *Delgado* the Court considered "factory surveys" by immigration agents. *Id*. at 212. The majority did not dispute the following description in Justice Brennan's opinion dissenting on the seizure issue:

> First, as the respondents explained, the surveys were carried out by surprise by relatively large numbers of agents, generally from 15 to 25, who moved systematically through the rows of workers who were seated at their work stations. Second, as the INS agents discovered persons whom they suspected of being illegal aliens, they would handcuff these persons and lead them away to waiting vans outside the factory. Third, all of the factory exits were conspicuously guarded by INS agents, stationed there to prevent anyone from leaving while the survey was being conducted. Finally, as the INS agents moved through the rows of workers, they would show their badges and direct pointed questions at the workers.

*Id.* at 230 (Brennan, J., concurring in part and dissenting in part) (citations omitted). In Justice Brennan's view, it was "simply fantastic to conclude that a reasonable person

5

could ignore all that was occurring throughout the factory and . . . have the temerity to believe that he was at liberty to refuse to answer their questions and walk away." *Id*. But the Court held that the factory workers were not seized. *Id*. at 218. It discounted the dissenters' concern with the stationing of agents near factory exits because the restrictions on the workers' freedom to move were a result of their work obligations and the workers "were not prevented by the agents from moving about the factories." *Id*. The presence of agents at the doors was merely "to insure that all persons in the factories were questioned." *Id*. "This conduct should have given [the workers] no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer." *Id*. And "the mere possibility that they would be questioned if they sought to leave the buildings should not have resulted in any reasonable apprehension by any of them that they would be seized or detained in any meaningful way." *Id*. at 219.

In *Michigan v. Chesternut*, 486 U.S. 567 (1988), the Supreme Court found no seizure even though the officers were clearly intent on speaking to the defendant. When the defendant saw officers in a police cruiser approaching an intersection, he promptly turned and began to run. *Id*. at 569. The cruiser caught up to him and drove alongside him. *Id*. The Court acknowledged that "[w]hile the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure." *Id*. at 575. It noted that there was nothing in the record reflecting "that the police activated a siren or flashers; or that they commanded [the defendant] to halt, or displayed any weapons; or that they operated

6

the car in an aggressive manner to block [the defendant's] course or otherwise control the direction or speed of his movement." *Id.* Thus, "the police conduct involved here would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon [the defendant's] freedom of movement." *Id*. at 575. The conduct was not "so intimidating that [the defendant] could reasonably have believed that he was not free to disregard the police presence and go about his business." *Id.* at 576 (internal quotation marks omitted).

A third informative opinion is *United States. v. Drayton*, 536 U.S. 194 (2002). Three police officers boarded a bus as part of a routine drug and weapons interdiction. *Id.* at 197. One knelt on the front driver's seat and faced the rear; he did not block the aisle or otherwise obstruct the bus exit. *Id.* at 197–98. A second officer was at the rear of the bus, facing forward. *Id*. at 198. The third worked his way from the back toward the front of the bus, speaking individually with the passengers as he went. *Id*. The Court stated that "the traditional rule, which states that a seizure does not occur so long as a reasonable person would feel free to disregard the police and go about his business, is not an accurate measure of the coercive effect of a bus encounter." *Id*. at 201 (internal quotation marks omitted). The passenger's freedom of movement might be confined in that he or she may not want to leave the bus because of the risk that it would depart without him or her, "but this is the natural result of choosing to take the bus; it says nothing about whether the police conduct is coercive." *Id.* at 201–02. The proper test, then, should be "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 202. Under that test, there was no

7

seizure. *See id.* at 203. The encounter was not coercive because "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." *Id.* at 204. That the officers wore sidearms was of no importance; it is well-known that officers are usually armed, so "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." *Id.* at 205. As in *Delgado,* the Court recognized that few passengers in that circumstance would refuse to cooperate. But they do so not because of coercion but because they "know that their participation enhances their own safety and the safety of those around them." *Id.* at 205.

The common thread in these cases is that a reasonable person would not feel coerced when officers are simply engaging in reasonable actions to conduct a consensual encounter. The operation may require multiple officers so that they can safely engage with what may be a number of people (as in *Delgado* and *Drayton*) and they may even stand at exits so they can be sure that they have the chance to address everyone present (again, as in *Delgado* and *Drayton*). But if the officers are not taking actions inconsistent with seeking a consensual encounter—such as using a siren or emergency lights, brandishing weapons, or speaking peremptorily—a reasonable person would feel free to refuse to cooperate.

Justice Stewart offered a few factors supporting the finding of a seizure in his opinion in *Mendenhall,* 446 U.S. at 554: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or

8

the use of language or tone of voice indicating that compliance with the officer's request might be compelled." But none of those factors is independently dispositive. "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary . . . with the setting in which the conduct occurs." *Chesternut*, 486 U.S. at 573. We must "assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Id.* On the only occasion on which the Supreme Court invoked the factors recited by Justice Stewart in *Mendenhall* to find a seizure, the Court said that there was "evidence of every one of the probative circumstances mentioned"; and there was more besides. *Kaupp v. Texas*, 538 U.S. 626, 631 (2003) (17-year-old boy was awakened in his bedroom by at least three officers, taken out in handcuffs in his underwear in January, and driven away in a patrol car).

What is the context here? Six officers were patrolling at night a dimly lit location known for violence and criminal activity. Their number was prudent, given the safety risk and the advantages of being able to approach several persons across a sizable parking lot at the same time. They used their lights to illuminate the interiors of vehicles so that they could see whether the vehicles were occupied and, if so, what was going on. When they saw someone, they approached in pairs. They did not turn on their emergency lights, brandish weapons, establish a checkpoint, or issue orders. If there is a less "intrusive" way to safely and effectively patrol such an area and conduct consensual interviews, it is not apparent to me. If reasonable suspicion is necessary to conduct such an operation, then officers could likely patrol such a location only after a reliable report of a criminal offense.

9

Considered in that light, the reasonable person contemplated by Supreme Court precedent would understand that the police were not compelling anyone to do anything. The person would not feel coerced by the police activity and "would feel free to decline the officers' requests or otherwise terminate the encounter." *Brendlin*, 551 U.S. at 255 (internal quotation marks omitted). True, almost any innocent person approached by officers in this situation would feel like complying. But that was equally true on the factory floors in *Delgado* and the bus in *Drayton*. What is missing here is any police conduct that conveys compulsion. I fail to see how, as the dissent puts it, "the officers specifically targeted [Defendant's] vehicle immediately upon arriving in the parking lot," Dissent at 7, any more than the officers "specifically targeted" the first person they questioned in *Delgado* or *Drayton*. Officers checking out a large gathering (such as cars in a parking lot) have to start somewhere.

As already noted, the mere presence of multiple officers is not in itself coercive, and in any event here the district court found that Defendant was not aware of the presence of any officers other than Officer Stephens and Sergeant Anderson. *See* R. at 51 n.3 ("There is no basis in the evidence for finding that the other squad cars that pulled into other parts of the parking lot contributed, in any way that is significant for present purposes, to the defendant's perception of his situation [.]").

Further, as we have held, there is no seizure when an officer merely approaches a person seated in a vehicle to ask what he is doing and requests a driver's license. *See United States v. Madden*, 682 F.3d 920, 925 (10th Cir. 2012); *see also United States v. Griffith*, 533 F.3d 979, 981, 983 (8th Cir. 2008) (no seizure when one officer approached

10

window of parked car to speak with driver while other walked around to the back for safety); *United States v. Taylor*, 511 F.3d 87, 91–92 (1st Cir. 2007) (no seizure when officers parked behind car and approached driver's window); *United States v. Williams*, 413 F.3d 347, 352 (3d Cir. 2005) (no seizure when officers drove up to parked van and then approached it on foot); *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994) ("[W]here . . . officers come upon an already parked car, th[e] disparity between automobile and pedestrian stops dissipates and the driver is not clearly stopped in any sense *ab initio*, except of his own volition.").

The use of a floodlight to illuminate the vehicle, as opposed to turning on emergency lights, also was not coercive. Other circuits have agreed that shining a light into a vehicle does not transform a consensual encounter into a seizure. *See, e.g.*, *United States v. Mabery*, 686 F.3d 591, 597 (8th Cir. 2012) ("In this case, the act of shining a spotlight on [the defendant's] vehicle from the street was certainly no more intrusive (and arguably less so) than knocking on the vehicle's window.")); *United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007) (no seizure when officer approached and shined flashlight into car); *United States v. Douglass*, 467 F.3d 621, 623–24 (7th Cir. 2006) (no seizure when officers parked in front of defendant's car, approached car from two sides, and shined flashlights into the car); *see also United States v. Clements*, 522 F.3d 790, 792, 794 (7th Cir. 2008) (no seizure when "officers shined a spotlight on the [parked] Oldsmobile *and activated their flashing red and blue lights* [to alert the car's occupants that they were going to approach the vehicle]" (internal quotation marks

11

omitted) (emphasis added)).  Were the officers supposed to check out the parking lot in the dark?

Finally, the approach of the officers toward the front of Defendant's car was not coercive.  To begin with, it is not clear that it was possible for the officers to approach from any other direction— Defendant had parked the car so that it was blocked on all other sides.  The officers' "resolute[]" approach, R. at 54, signaled no more than that they wished to talk with Defendant.  In ordinary social intercourse, one typically approaches another person head on when initiating a conversation.  Doing so does not signal that you will not give way if the other person so requests.  The officers' walking toward the front of Defendant's vehicle is less coercive than the guarding of the factory exits by immigration agents in *Delgado* or the officer's standing in the aisle while questioning bus passengers in *Drayton*.

I would hold that under the Supreme Court's reasonable-person approach, there was no seizure during the officers' initial approach to Defendant's car.  Their routine actions in pursuit of consensual conversations, taken separately or as a whole, did not convey that they were directing (coercing) Defendant into remaining where he was and engaging in conversation with them.  By the time the officers drew their weapons, they had reasonable suspicion to support their action.  Therefore, I concur in the affirmance of the district court.

16-6136, *United States v. Roberson*

**MORITZ**, Circuit Judge, dissenting:

I agree with the lead opinion that this case turns on the timing of Roberson's seizure. And I agree that the timing of Roberson's seizure turns on the timing of his submission. But I disagree with the lead opinion's conclusion that Roberson didn't submit—and that the officers therefore didn't seize him—until he put his hands on his steering wheel. Instead, I would hold that the officers seized Roberson within the first few seconds after the Gang Enforcement Unit, rolling four patrol cars and six officers deep, converged on Slick Willie's parking lot.

After parking their patrol car directly in front of Roberson's car, two of those four officers immediately "lit [his car] up with" disorienting takedown lights and spotlights, R. vol. 3, 16, and aggressively approached his car in a manner that blocked his exit path. Rather than fleeing in response to this forceful police presence, Roberson submitted to it by remaining seated in his parked car. In my view, at that point, Roberson was seized. And because, at that point, the officers admittedly had no suspicion—let alone reasonable suspicion—that Roberson was engaged in criminal activity, I would reverse and remand with directions to suppress the evidence obtained through his unlawful seizure.

I

The lead opinion is correct that the timing of Roberson's seizure turns on the timing of his submission. Lead Op. 12-13; *see Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission . . . ."). But I decline

to shortcut the analysis by assuming, rather than deciding, that the officers exhibited a show of authority.

Determining the *nature* of the show of authority is a critical step in determining when Roberson submitted. *Brendlin*, 551 U.S. at 262 (emphasizing that "what may amount to submission depends on what a person was doing before the show of authority; a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away"); *United States v. Lowe*, 791 F.3d 424, 430-31 (3d Cir. 2015) (explaining that submission question "depends on both the nature of the show of authority [and] the suspect's conduct at the moment the officer asserted his or her authority"). And because the nature of the show of authority here effectively commanded Roberson—the stationary occupant of a parked car—to stay put, I would conclude that *Brendlin* rather than *United States v. Salazar*, 609 F.3d 1059 (10th Cir. 2010), and *United States v. Mosley*, 743 F.3d 1317 (10th Cir. 2014), informs the submission analysis. Guided by *Brendlin*, I would conclude that Roberson immediately submitted to the officers' initial show of authority by remaining seated in his car.

### A

A show of authority occurs when an officer's words and actions would convey to a reasonable person that the officer is ordering the individual to restrict his or her movements. *California v. Hodari D.*, 499 U.S. 621, 628 (1991). To determine whether a show of authority has occurred, we sometimes ask whether, viewing all of the "circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554

2

(1980) (Stewart, J., concurring)). But "when a person 'has no desire to leave' for reasons unrelated to the police presence," the more relevant question is "whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Brendlin*, 551 U.S. at 255 (quoting *Florida v. Bostick*, 501 U.S. 429, 435-36 (1991)).

Under either of these formulations, we consider various factors—e.g., the location of the encounter, the number of officers involved, the nature of the officers' commands, the activation of sirens or lights, and the officers' attire and display of weapons—to measure the coercive effect of the encounter. *See United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017) (listing non-exclusive factors); *United States v. Little*, 18 F.3d 1499, 1504 (10th Cir. 1994) (noting that courts focus on "'the coercive effect of police conduct, taken as a whole,' on a reasonable person" (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988))).

Here, the record amply demonstrates the officers' initial actions would have conveyed to a reasonable person in Roberson's situation that he wasn't free to leave or otherwise terminate the encounter. The Gang Enforcement Unit—six officers in four marked Oklahoma City patrol cars—converged in a "wolf-pack" technique on Slick Willie's parking lot. R. vol. 3, 101. Two officers parked one patrol car 15 feet from the front of Roberson's car (the first occupied car they saw), while a second patrol car parked "[c]loser to" his car. *Id.* at 64. The first patrol car beamed spotlights and bright takedown lights through Roberson's windshield, and two armed, uniformed officers got out of that patrol car and "[w]alked toward the front of [Roberson's] car via a route that inhibited

3

[his] ability to leave." R. vol. 1, 55. At that point, no reasonable person in Roberson's situation would have believed that either getting out of the car and walking away or otherwise terminating the encounter was an option.

The district court concluded otherwise. But in doing so, it misapplied two basic Fourth Amendment principles. The district court stated that it found "no basis in the evidence for a finding that the other squad cars that pulled into other parts of the parking lot contributed, in any way that is significant for present purposes, to the defendant's perception of his situation." R. vol. 1, 51 n.3. My colleagues treat this as a factual finding and accept it. *See* Lead Op. 20 & n.15; Concurring Op. 1-2; s*ee also United States v. Moran*, 503 F.3d 1135, 1139 (10th Cir. 2007) ("[W]e accept the district court's factual findings . . . unless they are clearly erroneous." (quoting *United States v. Harris*, 313 F.3d 1228, 1233 (10th Cir. 2002))).

But I view the district court's refusal to consider the presence of the other patrol cars as a legal conclusion, and an erroneous one at that. Critically, the district court announced its factual findings at the end of the suppression hearing and, before doing so, advised both parties that they would "be stuck with [those] facts." R. vol. 3, 99. The court then found that "several officers arrived in separate cars," that "there [were] a total of four cars that had a total of six officers in them," and that the officers employed a "wolf-pack sort of technique." R. vol. 3, 101. And the court found credible Annette Byers' testimony that "[a]nother police car approached from the east" after the patrol car with "bright lights appeared and pulled up near the front of [Roberson's] car." *Id.* at 107-08. In fact, Byers testified that "possibly three police officers pulled up in different cars," and

4

that after the first car with lights parked in front of Roberson's car, a second car parked "[c]loser to the white car"—i.e., Roberson's car. *Id.* at 61, 64. Byers later reiterated that two patrol cars were "parked in front" of Roberson's car. *Id.* at 71. The court also found Sergeant Stephens' "account of the matter . . . credible." *Id.* at 109. And while Stephens testified that he didn't remember the location of the other officers' patrol cars, he also testified that it was "possible" Lieutenant Anderson (not Sergeant Anderson) "would have driven his vehicle around to . . . meet" Stephens' patrol car. *Id.* at 37.

By stating in its subsequent written order that the presence of multiple patrol cars didn't contribute "significantly" to Roberson's perception of the situation, R. vol. 1, 51 n.3, the district court misapplied Fourth Amendment principles. First, by considering only the actions of two officers in one patrol car, the court unduly narrowed its view of the totality of the circumstances. *See Chesternut*, 486 U.S. at 573 (noting that courts must "assess the coercive effect of police conduct, taken as a whole, rather than . . . focus on particular details of that conduct in isolation"). Second, by suggesting that Roberson's subjective perception of the events played a role in its analysis, the court failed to apply the proper perspective. *See Hodari D.*, 499 U.S. at 628 ("[T]he test for existence of a 'show of authority' is an objective one: not whether the *citizen* perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." (emphasis added)).[1]

---

[1] Even if I could join my colleagues in treating the district court's legal conclusion as a factual finding, I would reject it as clearly erroneous. As discussed, the district court expressly found that multiple patrol cars converged on the parking lot. And Byers'

5

The concurring opinion nonetheless follows the district court's errant path and reaches the same conclusion, i.e., that "[n]othing [the two officers] did amounted to an assertion of authority." Concurring Op. 2. The concurring opinion recognizes the proper test for determining if a show of authority occurred is "whether a reasonable innocent person 'would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Id.* at 3 (quoting *Brendlin*, 551 U.S. at 255). But the concurring opinion then posits that "[i]t is hardly obvious . . . how to determine whether a reasonable innocent person would feel free to leave or to decline a request" because, according to the concurring opinion, "most people will not 'feel' free to leave or refuse a request when confronted by a police officer." *Id.*

I don't disagree that, in many cases, the answer to the question of whether a reasonable person would feel free to terminate an encounter with one or more officers is "hardly obvious." *Id.* But in this case "it is obvious that [the] officers, without uttering any words, [were] exercising their authority—ordering compliance from [Roberson]." *Id.* at 4. The officers descended upon the parking lot en masse, and two officers specifically targeted the occupants of the first car they saw, parked their patrol car directly in front of that car, beamed disorienting spotlights and takedown lights toward that car, and

---

testimony supports that she was aware of their presence. But the district court didn't find, and there is no evidence to support, that Roberson—who was seated next to Byers in his car—was unaware of the other patrol cars. *See Hernandez*, 847 F.3d at 1263 (10th Cir. 2017) ("A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." (quoting *In re Vaughn*, 765 F.3d 1174, 1180 (10th Cir. 2014))). Rather, the court simply asserted that the presence of the other patrol cars didn't "contribute[] . . . to [Roberson's] perception of his situation." R. vol. 1, 51 n.3.

"walk[ed] toward the front of th[at] car via a route that inhibited [Roberson's] ability to leave." R. vol. 1, 55.

What is not so obvious is how the concurring opinion finds the three primary cases it discusses—*I.N.S. v. Delgado*, 466 U.S. 210 (1984); *Michigan v. Chesternut*, 486 U.S. 567 (1988); and *United States v. Drayton*, 536 U.S. 194 (2002)—"informative" with respect to these circumstances. Concurring Op. 7. *Delgado* and *Drayton* both involved multiple officers attempting "voluntary contact," *id.* at 5, with random individuals situated among larger groups of individuals. I don't doubt that a reasonable person might feel less intimidated when he or she is one among many workers in a large factory, *see Delgado*, 466 U.S. at 230 (Brennan, J., concurring in part and dissenting in part), or one among many passengers on a public bus, *see Drayton*, 536 U.S. at 198. But here, there was no large group of other individuals to dilute the coercive effect of the officers' actions. Roberson was one among two occupants in his private vehicle. And the officers specifically targeted his vehicle immediately upon arriving in the parking lot. Neither *Delgado* nor *Drayton* speaks to these circumstances.

The third case, *Chesternut*, did involve officers targeting a specific individual. 486 U.S. at 569. But the similarities between *Chesternut* and this case begin and end there. In *Chesternut*, the defendant saw a police car approaching the intersection where he was standing and ran the other way. *Id.* The officers caught up with him and drove their patrol car alongside him as he continued running. *Id.* As the concurring opinion points out, the Court found nothing in the record in that case to show that the officers used sirens or flashing lights, commanded the defendant to halt, or "operated the car in an aggressive

7

manner to block [the defendant's] course or otherwise control the direction or speed of his movement." Concurring Op. 6-7 (alteration in original) (quoting *Chesternut*, 486 U.S. at 575). Here though, Roberson was seated in his parked car when six police officers in four patrol cars converged on the parking lot; one patrol car parked directly in front of Roberson's car and trained its bright takedown lights and spotlights on his car; and two officers approached his parked car in a manner that inhibited his ability to drive away. To be fair, the officers here, like the officers in *Chesternut*, didn't explicitly command Roberson to halt. But it would make little sense for them to do so given that Roberson was seated in his parked car. Thus, like *Delgado* and *Drayton*, *Chesternut* bears little resemblance to this case.

Finally, the concurring opinion adopts a piecemeal approach to evaluating whether the officers exhibited a show of authority: it reasons that neither the presence of multiple officers, nor their action in "merely approach[ing]" Roberson's car to talk to him, Concurring Op. at 10, nor their "use of a floodlight to illuminate the vehicle," *id.* at 11, nor their manner of approaching the front of Roberson's blocked-in vehicle was coercive.

It's true, but unremarkable, that "there is no seizure when an officer merely approaches a person seated in a vehicle to ask what he is doing and requests a driver's license." *Id.* at 10. And I don't dispute that other circuits have concluded "that shining a light into a vehicle does not transform a consensual encounter into a seizure." *Id.* at 11. But the show-of-authority analysis requires us to consider "the coercive effect of police conduct, taken as a whole"—not in bits and pieces. *Chesternut*, 486 U.S. at 573. Thus, rather than sift through cases that each address only one or two of the circumstances that

8

exist here,[2] I consider collectively all of the circumstances present. And doing so leads me to disagree with the concurring opinion's conclusion that the officers' conduct in this case, taken as a whole, "signaled no more than that they wished to talk with [Roberson]," or equates to "ordinary social intercourse." Concurring Op. 12. Instead, the officers' conduct was a show of authority.

The only remaining question, therefore, is when Roberson submitted to that show of authority. And the answer to that question turns on *how* he submitted.

**B**

The lead opinion cites *Brendlin* for the proposition that "[a] show of authority alone is not a seizure 'without actual submission.'" Lead. Op. 8 (quoting *Brendlin*, 551

---

[2] For example, the concurring opinion cites *United States v. Mabery*, 686 F.3d 591 (8th Cir. 2012), and *United States v. Douglass*, 467 F.3d 621 (7th Cir. 2006) for the proposition that shining a spotlight on a parked car doesn't constitute a seizure. Concurring Op. 11. True enough. But in *Mabery*, one patrol car stopped near a parking lot entrance and shined a spotlight on the defendant's car from the street. Beyond that, the two officers in the patrol car "did nothing else that would support a demonstration of authority." 686 F.3d at 597. Moreover, even if the court had found a show of authority in *Mabery*, the defendant didn't submit to it; he "dropped his contraband and fled the police." *Id.* That isn't what happened here. *Douglass* is likewise dissimilar. There, two patrol officers responded to a possible assault in a parking lot. Armed with an address, a specific description of the vehicle believed to be involved, and the license plate number of that vehicle, the officers found the suspect vehicle, parked their patrol car directly in front of it and—with one officer on each side—approached the car. 467 F.3d at 622. One officer asked the man seated in the driver's seat for identification. *Id.* At the same time, the second officer shined a flashlight into the car, saw ammunition, and shouted "'10-32,' the police code for a gun." *Id.* The first officer drew his gun and ordered the man out of the car, but the man "seemed to be looking around[,] possibly for an escape route," and refused to get out of the car. *Id.* Like the officers, the man then found what he was looking for: he put his car in gear, drove around the patrol car, and fled the parking lot. *Id.* at 622-23. Each of these cases shares some similarities with this one, but not enough to offer any meaningful guidance.

U.S. at 254). I agree. But, after a brief nod to *Brendlin*, the lead opinion builds its submission analysis around *Salazar* and *Mosley*. In doing so, the lead opinion (1) disregards *Brendlin*'s guidance that an individual can submit to a show of authority through passive acquiescence and (2) overlooks a critical distinction between the show of force here and the show of force in *Mosley*.

In *Brendlin*, the question before the Court was "whether a traffic stop subjects a passenger . . . to [a] Fourth Amendment seizure." *Id.* at 254. The *Brendlin* Court answered that question in the affirmative, holding that a traffic stop seizes a passenger of a stopped car just as it seizes a driver. *Id.* at 251. In reaching that conclusion, the Court rejected the notion that a passenger can't be seized by a traffic stop simply because he or she has no ability to signal submission to the officer's command to stop the car. *Id.* at 261-62. Specifically, the Court acknowledged that while the vehicle in which the defendant was a passenger was moving, the defendant "had no effective way to signal submission." *Id.* at 262. But the Court concluded that once the car "came to a stop," the defendant "could, and apparently did, submit by staying inside." *Id.*

Critically, the Court emphasized that "what may amount to submission depends on what a person was doing before the show of authority; a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Id.* And the Court explained that "when an individual's submission to a show of governmental authority takes the form of passive acquiescence," the "test for telling when a seizure occurs" is the *Mendenhall/Bostick* test. *Brendlin*, 551 U.S. at 255.

10

Applying that test, the Court determined that the officers seized the defendant when they effected the traffic stop because (1) "any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission," *id.* at 257, and (2) the defendant submitted through passive acquiescence by remaining inside the car during the traffic stop, *id.* at 262.

Here, as discussed, the officers' initial show of authority implicitly commanded Roberson—the stationary occupant of a parked car—to stay put. Thus, *Brendlin* informs the submission analysis. *See, e.g.*, *United States v. Stover*, 808 F.3d 991, 1001-02 (4th Cir. 2015) (Gregory, J., dissenting) (reasoning that *Brendlin*'s "passive acquiescence test" applied to determine when officers seized occupant of parked car); *United States v. Jones*, 562 F.3d 768, 774 & n.3 (6th Cir. 2009) (applying *Brendlin* to determine if occupants of car that was "hemmed in" by two police vehicles submitted to show of authority).

And applying *Brendlin*, I would conclude that Roberson immediately submitted to the officers' command through passive acquiescence by remaining seated in his parked car in response to the command to stay put, rather than attempting to flee on foot or run over the approaching officers by driving away. *Compare Lowe*, 791 F.3d at 433 (citing *Brendlin* for proposition that "responding to a show of authority by staying put is a means of passively submitting to that authority"), *with Jones*, 562 F.3d at 774 (applying *Brendlin* and concluding that defendant didn't submit because he "did not passively

11

acquiesce; he did not remain seated in the Nissan . . . . Rather, he opened the car door and 'jumped out' as though he wanted to run").

But the lead opinion disregards *Brendlin*'s guidance on submission through passive acquiescence. Rather than applying the *Mendenhall*/*Bostick* test, the lead opinion applies a slightly different one. It states, "Actual submission depends on 'the view of a reasonable law enforcement officer' under 'the totality of the circumstances.'" Lead Op. 8 (quoting *Salazar*, 609 F.3d at 1064-65); *see also id.* at 15 ("[W]hether and when an individual submits to a show of authority turns on the perception of a reasonable officer, not that of the individual."). But the *Mendenhall*/*Bostick* test says nothing about analyzing submission from a reasonable officer's view. *See Brendlin*, 551 U.S. at 255 (explaining the relevant test for determining whether the defendant submitted through passive acquiescence is "whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter'" (quoting *Bostick*, 501 U.S. at 436)).

I agree that this court adopted a "reasonable officer" test in *Salazar*. *See* 609 F.3d at 1065 ("[W]e consider whether a citizen has submitted to authority by examining the view of a reasonable law enforcement officer under the circumstances." (citing *United States v. Cardoza*, 129 F.3d 6, 14 n.4 (1st Cir. 1997))). And I recognize that we are bound by *Salazar*. But I nevertheless question its basis for adopting such a test. Significantly, *Salazar* cited *Cardoza* for support. *See id.* But *Cardoza* said only, "[G]iven the generally objective standards employed in Fourth Amendment seizure analysis, we would see little reason to inquire into the subjective intent of the detainee in making the determination

12

whether or not he or she has 'submitted to' a show of authority." *Cardoza*, 129 F.3d at 14 n.4.

It simply doesn't follow from the fact that we don't inquire into the detainee's subjective intent that we must therefore necessarily inquire into a reasonable officer's view of the circumstances. Moreover, we appear to be the only circuit that has explicitly adopted this "reasonable officer" test. *See Stover*, 808 F.3d at 1006-07 (Gregory, J., dissenting) (criticizing *Salazar* as "troubling precedent," noting that "the Tenth Circuit has offered no analytical basis for its 'reasonable officer' rule," and pointing out that no other circuit has explicitly adopted it).

In addition to adding the *Salazar* gloss to the *Mendenhall*/*Bostick* test, the lead opinion opts to follow *Mosley* while overlooking a critical distinction between the show of force there and the one in this case. In *Mosley*, two officers responding to an anonymous tip approached a parked car in a Denny's parking lot. 743 F.3d at 1321. The officers took the occupants of the car by surprise, and, with weapons drawn, immediately commanded the occupants to show their hands. *Id.* One occupant complied. But the defendant did not—at least, not immediately. Instead, he "hesitated briefly," "began making furtive motions," and ignored the officers' repeated commands before eventually complying. *Id.*

In determining when the defendant was seized in *Mosley,* we reasoned that "the officers clearly showed their authority by raising their weapons and shouting 'hands up,' but [d]efendant—although he may have frozen momentarily out of confusion—did not immediately manifest compliance with their orders." *Id.* at 1327. And we suggested that

had the defendant "simply sat still in response to the officer's commands and allowed himself to be seized from the outset, the seizure may not have been valid." *Id.* But we held that the defendant, by making furtive motions and therefore acting "directly contrary to the officers' commands," "did not manifest submission." *Id.* Thus, we concluded that the officers didn't seize the defendant until he "manifested compliance with the officers' orders—when he put his hands up." *Id.*

The lead opinion applies *Mosley*'s reasoning to conclude that Roberson didn't submit, and therefore wasn't seized, until he complied with the officers' commands to show his hands by placing his hands on the steering wheel. Lead Op. 17. But in doing so, the lead opinion overlooks a critical distinction between the show of force here and the show of force in *Mosley*. Here, the officers didn't sneak up on Roberson and catch him by surprise, as did the officers in *Mosley*. Nor did they immediately order him to show his hands. Instead, after the officers here forcefully made their presence known, Roberson had at least a few seconds to process that several patrol cars had entered the parking lot, one patrol car had pinpointed him by shining bright lights on his car, and two officers were aggressively approaching his car. Because this show of authority was an implicit command for Roberson to stay put—not an immediate and explicit command for Roberson to show his hands[3]—and because Roberson complied with that order, *Mosley*'s

---

[3] The lead opinion characterizes this distinction as immaterial. Lead Op. 21-22. But this distinction is key. As I've stated, the officers in *Mosley* approached the car in which the defendant was a passenger, drew their guns, and explicitly ordered the defendant to raise his hands. 743 F.3d at 1321, 1327. Here, the officers approached Roberson's car with a show of authority that effectively, albeit implicitly, ordered

14

submission analysis simply doesn't apply here. *See Mosley*, 743 F.3d at 1326

(emphasizing that in order to submit to show of authority, individual must comply with

police orders).

Finally, relying on *Mosley*, the lead opinion makes much of Roberson's stuffing

motions. But I see no reason to consider them. Unlike the defendant in *Mosley*, who made

stuffing motions in direct defiance of an explicit command to put his hands up, Roberson

made those motions only after he submitted to the officers' initial command to stay put

and, critically, before the officers ever commanded him to raise his hands.[4] In short, the

officers' initial show of authority ordered Roberson to stay put. And he did. Their

command and Roberson's immediate compliance with it constituted a seizure. Thus, I

---

Roberson to remain in place. But they didn't immediately order him to raise his hands. Thus, Roberson complied with the officers' initial implied order to remain in place, whereas the defendant in *Mosley* directly disobeyed the officers' initial order to raise his hands. *Mosley*, 743 F.3d at 1327.

[4] Notably, even the defendant in *Brendlin* didn't remain frozen in place after he submitted to the show of authority by remaining seated inside the stopped vehicle in which he was a passenger. Instead, he "briefly open[ed] and then close[d] the passenger door" in full view of the officer conducting the traffic stop. 551 U.S. at 252. Yet in concluding that the defendant in *Brendlin* submitted by remaining inside the stopped car, *id.* at 262, the Court summarily dismissed the state court's suggestion that the defendant's movements signaled he was "awar[e] of the available options," i.e., the options to not submit, either by leaving or otherwise ignoring the officers' commands. *Id.* at 258 n.4 (alteration in original) (quoting *People v. Brendlin*, 136 P.3d 845, 852 (Cal. 2006)). Instead, the Court reasoned that the defendant's "conduct could equally be taken to indicate that [he] felt compelled to remain inside the car." *Id.* at 258 n.4. The Court didn't even hint that the defendant's post-seizure movements somehow negated the defendant's initial submission. *Id.* at 261-63.

wouldn't consider anything that happened after that point—including Roberson's post-seizure stuffing motions—as evidence of non-submission.[5]

*    *    *

While Sergeant Stephens may have subjectively "hoped and intended" to initiate voluntary contact with Roberson, R. vol. 1, 54, the officers' collective actions objectively demonstrate that there was nothing voluntary about Roberson's New Year's Eve encounter with the police. Instead, as Roberson and his date sat in Roberson's car in the parking lot of Slick Willie's pool hall, four patrol cars carrying six officers converged all at once in a pack and two officers immediately zeroed in on Roberson's car, admittedly with absolutely no suspicion or basis for doing so. They purposely blinded Roberson with their takedown lights. And with their aggressive approach on foot, they effectively blocked his vehicle from leaving the parking lot. I would conclude that, with these blatant and purposeful actions, the officers unlawfully seized Roberson by asserting a show of authority to which he immediately submitted by remaining seated in his car. Further, I would find that Roberson's post-seizure stuffing motions did not belatedly transform that unlawful seizure into a lawful one. Thus, I would reverse and remand with directions to suppress the evidence derived from the illegal seizure.

---

[5] I don't discount that, for safety reasons, the officers were justified in ordering Roberson to raise his hands after he began making stuffing motions. But the officers simply can't rely on Roberson's post-seizure stuffing motions, his non-compliance with post-seizure commands, or their ultimate discovery of incriminating evidence to justify the unlawful seizure.